766 A.2d 1151 (2001)
337 N.J. Super. 228
STATE of New Jersey, Plaintiff-Respondent,
v.
Taysir SHEIKA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 10, 2001.
Decided February 9, 2001.
*1154 Miles Feinstein, Clifton, argued the cause for the appellant.
Michael J. Williams, Deputy Attorney General, argued the cause for respondent, (John J. Farmer, Jr., Attorney General, attorney; Mr. Williams, of counsel and on the brief).
Before Judges BAIME, WALLACE, Jr. and CARCHMAN. *1152
*1153 The opinion of the court was delivered by BAIME, P.J.A.D.
On the night of June 5, 1992, Russell Ferguson was robbed and fatally beaten. Following a protracted jury trial, defendant was found guilty of felony murder (N.J.S.A. 2C:11-3a(3)), second degree robbery (N.J.S.A. 2C:15-1), and second degree conspiracy (N.J.S.A. 2C:5-2). His alleged accomplice, Charif Abdul, was convicted of second degree robbery and second degree conspiracy, but was acquitted of felony murder. After merging the convictions, the trial court sentenced defendant to sixty years imprisonment with a thirty year parole disqualifier. Defendant appeals from the resulting judgment and the denial of his petition for post-conviction relief. We affirm defendant's conviction, but remand the matter to the Law Division for further proceedings.

I.
Ferguson was a Paterson firefighter. On the night of the incident, he and his friends, Joseph Parkin, Charles Parkin, and David Prosser, imbibed substantial quantities of alcohol at Rosie's Tavern. Ferguson was extremely inebriated, so much so that the bartender refused to continue serving him. At some point, Ferguson left the tavern alone.
Although the exact chronology of events is not entirely clear, Ferguson ultimately encountered defendant, Abdul, Ahmadnour Ayoub, Isaam Atshan, Raaid Thabata and Marilyn Carrerro, who had gathered outside *1155 a nearby restaurant. Ferguson appeared helplessly intoxicated. Taking advantage of that condition, defendant and Abdul threw the victim to the ground. Defendant grabbed Ferguson's firefighter's medallion while Abdul relieved the victim of his wallet. In a statement given to the police upon his arrest, Atshan described how defendant repeatedly kicked Ferguson as he lay helpless on the sidewalk. Although Atshan disavowed that statement at trial, he admitted that he observed defendant and Abdul flee from the scene following the robbery.
Thabata and Carrerro departed in Carrero's automobile. They subsequently encountered defendant, Abdul and Atshan several blocks away. Defendant proudly displayed Ferguson's gold chain, noting that he had "mugged" the victim. Thabata and Carrero drove the three men to a nearby destination.
Meanwhile, Ferguson was able to make his way to Rosie's Tavern. According to Prosser, Ferguson appeared intoxicated and disheveled. Ferguson told Parkin "they got me," but was initially unable to explain what happened. He later related that he had been kicked and punched in the back and groin, but he could give no further details concerning the crime. Ferguson complained of abdominal pain, but refused medical assistance.
The Parkins drove Ferguson to his house. With their assistance, he was able to exit from the car, but he was "bent over" and could not stand erect. After helping Ferguson undress, the Parkins departed. Ferguson's wife, Cecelia, was not present, having moved out of the house three weeks earlier to assist her invalid mother.
Cecelia returned to the house the next morning. Unable to push the door more than a few inches, she peered in the crack and observed Ferguson's bare shoulder. The emergency squad was immediately summoned. They found Ferguson's body propped against the door. A search of the house revealed that the bathroom toilet was cracked and leaking. Feces were found in and around the bathtub. Ferguson was pronounced dead at the scene.
Dr. Lyla Perez performed the autopsy. She found that Ferguson's tenth and eleventh ribs were fractured, and that the decedent had suffered three deep lacerations in his spleen. Perez also found a deep hemorrhage of the muscles surrounding Ferguson's back. Although Ferguson suffered from advanced cirrhosis of the liver, Perez unequivocally concluded that the "laceration[s] of the spleen with contusions and intra-abdominal hemorrhage ... and rib fractures" constituted the cause of death. Perez also determined that the injuries were consistent with the decedent having been repeatedly kicked in the area of his ribs. Perez discounted the possibility that Ferguson's death was a result of a fall or contact with a toilet. Such an accident would have resulted in large bruising on the outside of the skin. Perez emphasized that such an occurrence would not cause a ruptured spleen.
The police investigation revealed that defendant, Atshan, Thabata, and Omar Ayoub (Ahmadnour's brother) met on the afternoon of the day Ferguson's body was discovered. Defendant sold the gold chain he had stolen from Ferguson to Omar, but retained the firefighter's medallion. Defendant, Abdul and Atshan divided the proceeds. Omar subsequently discarded the chain upon learning that the police were investigating Ferguson's death.
On June 8, 1992, the police arrested Abdul on an unrelated charge. While transporting Abdul to the police station, one of the officers mentioned the investigation relating to Ferguson. Abdul spontaneously replied, "you must be talking about the chain." The police then apprised Abdul of his constitutional rights. Abdul thereafter confessed his participation in the crime.
The police arrested defendant later that day. He too was advised of his constitutional rights. After initially disclaiming any involvement, defendant admitted that he had participated in the robbery and *1156 might have kicked Ferguson while relieving the victim of his gold chain and medallion. Defendant stated that he had given the medallion to his girlfriend. She later brought the item to the police station at defendant's request.
It is against this backdrop that we address defendant's arguments. Defendant contends: (1) his confession was improperly admitted, (2) he was deprived of the effective assistance of counsel, (3) the jury's verdict was tainted by prosecutorial misconduct, (4) evidence pertaining to the victim's background should not have been introduced, (5) he was denied his right to confrontation by the prosecution's failure to divulge the identity of a confidential informant, (6) hearsay information was improperly admitted, (7) his right to a meaningful appeal was denied because not all sidebar conferences were stenographically recorded, (8) the State deprived him of due process by failing to preserve tangible evidence, (9) the conspiracy count should not have been submitted to the jury, (10) several jurors should have been struck because of their close relationship with law enforcement, (11) the instructions on robbery were not tailored to the facts of the case, (12) the charge on reasonable doubt was insufficient, (13) the jury should have been instructed on the statutory defense to felony murder, (14) the charge on accomplice liability was inadequate, and (15) the instructions on felony murder were confusing. Although this was not an error-free trial, we find no sound basis to disturb defendant's conviction. We nevertheless remand the matter for an evidentiary hearing respecting several of defendant's claims of ineffective assistance of counsel.

II.
Defendant first contends that the court erred by denying his pretrial motion to suppress his confession. The salient facts were hotly contested.
Sergeant Raymond Reid and Detective Timothy Jordan testified for the State. Both officers related that they arrested defendant on June 8, 1992, and that they apprised him of his constitutional rights while he was being transported to police headquarters. After indicating that he understood his rights, defendant expressed his awareness of Ferguson's robbery, but denied any involvement.
The interrogation continued at the police station. For the first time, Reid informed defendant of Ferguson's death. Shortly after this revelation, defendant agreed to give a statement. Defendant was again advised of his constitutional rights. Before giving a written statement, defendant signed a formal waiver. The statement took approximately two hours to complete. Reid testified unequivocally that no threats were made and that none of the officers present displayed a weapon during the questioning.
Jordan's testimony essentially mirrored that of Reid. Specifically, Jordan testified that defendant became visibly upset after being apprised of Ferguson's death. At that point, defendant agreed to sign a formal waiver of his rights and to provide a written statement. Like Reid, Jordan was questioned on cross-examination as to whether any threats were made or force employed in order to obtain a confession. Jordan adamantly denied any suggestion that defendant was coerced. Jordan could not recall whether Captain William Buckley was present when defendant was questioned. When asked if he "recalled whether Buckley took his gun out ... and placed it on the desk in front of [defendant] ... at any stage [of the interrogation,]" Jordan responded that he "did not."
Defendant testified that he was not apprised of his constitutional rights until after he gave the written statement. According to defendant's testimony, Captain Buckley unholstered his gun and placed it on the desk while threatening to "beat [him] up if [he] did not tell him" the whereabouts of Ferguson's medallion. Defendant claimed that Buckley again threatened him when he continued to refuse to confess. Defendant testified that he ultimately succumbed to Buckley's threats and gave a written statement. He asserted *1157 that he first learned that Ferguson had died only after giving his written statement.
In denying the motion to suppress, the trial judge emphasized that he believed the testimony of Reid and Jordan and found defendant's account to be incredible. The judge found specifically that Buckley never displayed his weapon or otherwise threatened defendant during the interrogation. The judge determined that defendant was advised of his rights while being transported to police headquarters, that he was readvised at the police station before signing the written waiver, that the officers informed him of Ferguson's death prior to his confession, and that the written statement was voluntarily given.
The trial judge's factual findings are supported by substantial credible evidence present in the record. State v. Barone, 147 N.J. 599, 615, 689 A.2d 132 (1997). We are obliged to defer to the trial judge's credibility determination to the extent that it was grounded in the court's opportunity to observe the character and demeanor of the witnesses, an opportunity that we appellate judges are not afforded. See State v. Locurto, 157 N.J. 463, 472, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). It cannot fairly be said that the trial judge went wide of the mark in his determination that the State had sustained its burden of proof respecting the question of voluntariness. State v. Galloway, 133 N.J. 631, 654, 628 A.2d 735 (1993).
We are nevertheless constrained to note a troubling aspect of this case. Defendant interprets Jordan's response to defense counsel's cross-examination as meaning that the witness could not recall whether or not Buckley displayed his firearm in a threatening manner during the course of the interrogation. While perhaps this is a plausible construction of the record, we read the transcript differently. We construe Jordan's answer as an unequivocal denial of defendant's claim that Buckley threatened him by displaying his service revolver.
It is nonetheless unfortunate that the State failed to call Buckley or other additional witnesses who might have either rebutted defendant's claim of coercion or otherwise shed light on the incident. Two states, Arkansas and Mississippi, have adopted the rule that whenever an accused offers testimony that his confession was induced by violence, threats or coercion, the prosecution has the burden to produce all material witnesses who were connected with the controverted incriminatory statement or give an adequate explanation for their absence. See, e.g., Bell v. State, 324 Ark. 258, 261, 920 S.W.2d 821, 822 (1996); Griffin v. State, 322 Ark. 206, 213, 909 S.W.2d 625, 629 (1995); Foreman v. State, 321 Ark. 167, 173, 901 S.W.2d 802, 804 (1995); Remeta v. State, 300 Ark. 92, 99, 777 S.W.2d 833, 837-38 (1989); Bushong v. State, 267 Ark. 113, 117-18, 589 S.W.2d 559, 561 (1979), cert. denied, 446 U.S. 938, 100 S.Ct. 2157, 64 L.Ed.2d 791 (1980); Gammel & Spann v. State, 259 Ark. 96, 101, 531 S.W.2d 474, 478 (1976); Russey v. State, 257 Ark. 570, 572, 519 S.W.2d 751, 754 (1975); Northern v. State, 257 Ark. 549, 551, 518 S.W.2d 482, 484 (1975); Smith v. State, 256 Ark. 67, 68, 505 S.W.2d 504, 506 (1974); Smith v. State, 254 Ark. 538, 542, 494 S.W.2d 489, 491 (1973); Kircher v. State, 753 So.2d 1017, 1024 (Miss.1999); Underwood v. State, 708 So.2d 18, 30 (Miss.1998); Morgan v. State, 681 So.2d 82, 89 (Miss.1996); Thorson v. State, 653 So.2d 876, 888 (Miss.1994); Agee v. State, 185 So.2d 671, 673 (Miss.1966). Illinois has flirted with the rule, see People v. Brooks, 115 Ill.2d 510, 106 Ill.Dec. 30, 505 N.E.2d 336 (1987); People v. Rogers, 303 Ill. 578, 136 N.E. 470 (1922); People v. Lumpp, 113 Ill.App.3d 694, 69 Ill.Dec. 528, 447 N.E.2d 963 (1983); People v. McClure, 43 Ill.App.3d 1059, 3 Ill.Dec. 23, 358 N.E.2d 23 (1976), but has more recently rejected it, People v. R.D., 155 Ill.2d 122, 184 Ill.Dec. 389, 613 N.E.2d 706 (1993).
We decline to adopt a per se rule that the trial courts must refuse to admit a confession into evidence unless the State *1158 has presented as witnesses every police officer and everyone present at the defendant's interrogation. In the final analysis, whether a confession is voluntary or involuntary depends upon the quality of the evidence presented, which must be determined by the trial court. If in order to resolve a factual question, the trial court requires that all of the material witnesses be called, it may request the prosecutor to present such witnesses. People v. R.D., 155 Ill.2d at 138, 184 Ill.Dec. 389, 613 N.E.2d at 714 (citing People v. Patterson, 154 Ill.2d 414, 450-51, 182 Ill.Dec. 592, 610 N.E.2d 16, 32 (1992)). Although we do not decide whether a trial court may call a material witness on its own if the prosecutor refuses, the judge surely can find a deficiency in the State's proofs by reason of the absence of the witness. We stress that the State must prove the voluntariness of a confession beyond a reasonable doubt. State v. Galloway, 133 N.J. at 654, 628 A.2d 735; see also State v. Kelly, 61 N.J. 283, 294, 294 A.2d 41 (1972). If the prosecution fails to present a critical witness bearing upon the question of voluntariness, it faces the strong likelihood that the defendant's confession will be suppressed. We are satisfied that these principles are sufficiently protective of an accused's rights.
In any event, the State presented overwhelming evidence that defendant's confession was voluntarily given. The confession was properly admitted into evidence.

III.
We turn to defendant's argument that he was deprived of the effective assistance of counsel. Several of defendant's contentions were raised in his petition for post-conviction relief and are again advanced here. Others are presented for the first time in defendant's direct appeal from the judgment of conviction. We consider all claims together.
We begin with a brief recitation of the applicable principles. To prevail on a claim of ineffective assistance of counsel, a defendant must first show that his attorney made serious professional errors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). Second, it must be established that the attorney's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Ibid.
To establish the first prong of the test, defendant must prove that counsel's representation fell below an objective standard of reasonableness, measured by prevailing professional norms. Id. at 687-88, 104 S.Ct. at 2064-65, 80 L.Ed.2d at 693. "Because of the difficulties inherent in making this evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694-95. A court deciding an ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of the attorney's conduct. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.
To prove the second prong, defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. The error committed must be so serious as to undermine our confidence in the jury's verdict. State v. Fritz, 105 N.J. 42, 60, 519 A.2d 336 (1987). It is not enough for the defendant to show that the error or errors had some conceivable effect on the outcome of the trial.
Defendant first argues that he was prejudiced by his attorney's concession that he committed the robbery. This concession *1159 was first made in counsel's opening statement and was later repeated in the attorney's closing remarks. The gist of counsel's contention was that even if defendant robbed Ferguson, he was not guilty of felony murder because the robbery did not cause the victim's death. More specifically, he asserted that Ferguson's injuries occurred after the robbery and were caused by the victim's intoxication.
Defense counsel's argument was grounded in N.J.S.A. 2C:11-3a(3) and N.J.S.A. 2C:2-3e. N.J.S.A. 2C:11-3a(3) states that a person is guilty of felony murder if when engaged in committing one of the enumerated offenses, he "causes the death of a person other than one of the participants." Under N.J.S.A. 2C:2-3e, a felony is considered the cause of death when, but for the commission of the offense, the death would not have occurred, and when the death is "a probable consequence of the [defendant's] conduct." Thus, a defendant may not be found criminally liable for a death that occurs in the course of a felony if that death is too remotely related or accidental. State v. Martin, 119 N.J. 2, 32, 573 A.2d 1359 (1990).
We are satisfied that counsel's concession constituted a reasonable strategy in light of the evidence presented. The State presented overwhelming evidence that defendant participated in the robbery. However, the causal relationship between the commission of that crime and Ferguson's death was somewhat problematical. It was arguable that Ferguson was not seriously injured when he returned to Rosie's Tavern. It was also arguable that Ferguson's extreme inebriation caused him to fall against the toilet once he returned to his home. We have no occasion to second guess defense counsel's tactical decision under the "`distorting effects of hindsight.'" State v. Bey, 161 N.J. 233, 251, 736 A.2d 469 (1999) (quoting State v. Marshall, 148 N.J. 89, 156-57, 690 A.2d 1 (1997)). Trial counsel may not be considered ineffective merely because the trial strategy failed. State v. Davis, 116 N.J. 341, 357, 561 A.2d 1082 (1989).
Defendant's reliance on State v. Harrington, 310 N.J.Super. 272, 708 A.2d 731 (App.Div.), certif. denied, 156 N.J. 387, 718 A.2d 1216 (1998) is clearly misplaced. There, we found that the defendant's attorney was constitutionally deficient when he conceded that the defendant was guilty of committing a robbery that was the predicate to a felony murder charge. Id. at 282, 708 A.2d 731. We said that the concession inexorably led to the defendant's conviction of felony murder. Ibid. In contrast, counsel's concession here was part of a carefully crafted defense designed to result in an acquittal of the felony murder count. Harrington is thus clearly inapposite.
In a similar vein, we reject defendant's argument that counsel was ineffective because he conceded that the rights set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were given by the police when defendant was transported to headquarters. It will be recalled that defendant's principal claim was that he was coerced into confessing by Captain Buckley's threats. An additional attackone challenging whether the Miranda warnings were properly given might have had the effect of diluting defendant's assertion that his statement was involuntary. The attorney's tactical decision cannot reasonably be challenged from the vantage point of twenty-twenty hindsight. On the record before us, it cannot be said that counsel's performance in this regard was deficient or that such deficiency prejudiced defendant's right to a fair trial.
Defendant's other claims of ineffective assistance of counsel cannot fairly be decided without an evidentiary hearing. These include defendant's contentions that: (1) trial counsel was encumbered by an undisclosed conflict of interest, (2) his attorney failed adequately to consult with him and investigate his claims of innocence, *1160 and (3) his lawyer did not inform him of his right to testify. We discuss these arguments seriatim.
It is undisputed that trial counsel's daughter is an assistant prosecutor in Passaic County, the very office that prosecuted defendant. Although another assistant prosecutor represented the State at trial, defendant asserts that his attorney had dual loyalties.
It is axiomatic that a defense attorney's representation must be "untrammeled and unimpaired," his loyalty undivided. Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680, 699 (1942); see also State v. Bellucci, 81 N.J. 531, 538, 410 A.2d 666 (1980); State v. Land, 73 N.J. 24, 31, 372 A.2d 297 (1977); State v. Green, 129 N.J.Super. 157, 161, 322 A.2d 495 (App.Div.1974). There is no greater impairment of a defendant's constitutional right to counsel than that which can occur when his attorney is serving conflicting interests. State v. Bellucci, 81 N.J. at 538, 410 A.2d 666. The resulting representation may be more harmful than the complete absence of a lawyer. Ibid.
In State v. Bellucci, an attorney who had represented the defendant in his prosecution for gambling offenses previously had represented two codefendants in the same case prior to their pleading guilty. In addition, the attorney's law partner had represented yet another codefendant in the same action and continued to represent him at a joint trial. Regarding the prior representation, the Supreme Court found clear evidence that the attorney's obligations to preserve the confidences and secrets of his prior clients had the strong potential to affect his representation. Id. at 540-41, 410 A.2d 666. The Court viewed the conflict of interest as substantial, creating a great likelihood of prejudice, thus rendering the attorney's representation of Bellucci constitutionally defective. Id. at 539-41, 410 A.2d 666. The Court also found a conflict in the attorney's representation of Bellucci at the same trial in which his law partner had represented a codefendant. Id. at 541-43, 410 A.2d 666. The Court held that such joint representation by private law partners created a per se conflict such that actual prejudice need not be shown. Ibid. Thus, whether the joint representation had occurred through a single attorney or by associated attorneys, "once a potential conflict exists, prejudice will be presumed in the absence of waiver." Id. at 543, 410 A.2d 666. The Court added, "[i]n no event is waiver to be found from a silent record." Id. at 544, 410 A.2d 666.
In subsequent decisions, the Court has construed Bellucci as "creat[ing] a two-tier system for evaluating conflict-of-interest claims." State v. Norman, 151 N.J. 5, 24, 697 A.2d 511 (1997). Dual representations have been said to represent a per se conflict, in which case prejudice is presumed absent a valid waiver. Id. at 24-25, 697 A.2d 511. Otherwise, the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must be shown to establish constitutionally defective representation. Id. at 25, 697 A.2d 511; see also State v. Bell, 90 N.J . 163, 171, 447 A.2d 525 (1982).
The Court has considered three factors in determining whether a conflict per se exists or whether the conflict is merely a potential one. The first factor pertains to the extent to which there is ready access to confidential information among the attorneys. State v. Bellucci, 81 N.J. at 541, 410 A.2d 666. In Bellucci, for example, the Court found that dual representation of defendants by partners presented a per se conflict because firm members typically have access to, and share, confidential information. Ibid.; see also State v. Norman, 151 N.J. at 29, 697 A.2d 511. The second factor relates to whether, and to what extent, the attorneys share an economic interest. For example, in Bellucci, the law firm had an equal financial incentive to retain the defendants where it disserved its clients' interests whether or not the defendants were represented by a single partner or by separate partners, thus creating per se conflict. In State v. Bell, *1161 however, the Court determined that public interest firms, such as the Public Defender's Office, have no financial incentive in retaining the cases of joint defendants who might thereby be prejudiced. 90 N.J. at 168, 447 A.2d 525. The third factor concerns whether, and to what extent, public confidence in the integrity of the law profession might be compromised or eroded by permitting the case to proceed notwithstanding the potential for mischief. Id. at 168-69, 447 A.2d 525; State v. Bellucci, 81 N.J. at 541-42, 410 A.2d 666.
Applying these principles, we decline to expand Bellucci`s per se conflict rule to the facts presented here. Although the conflicts problems arising out of trial counsel's relationship with his daughter are myriad, complex and pose a real potential for prejudice, the accessibility to confidential information, financial incentive to disserve the client, and public perception of lack of integrity are not so stark as to compel an ironclad, per se rule of constitutional ineffectiveness. In reaching this conclusion, we emphasize the danger of creating absolute rules that are inflexible in recognizing the subtleties of the facts of specific cases. We doubt the practical efficacy of a rule requiring automatic reversals of well-supported criminal convictions without inquiry into the fairness and justness of the verdict. See State v. Grice, 109 N.J. 379, 384-85, 537 A.2d 683 (1988). Instead, we recognize the desirability of a flexible rule that would not compromise the constitutional right to "effective and unconflicted representation." State v. Norman, 151 N.J. at 29, 697 A.2d 511; State v. Bell, 90 N.J. at 169-71, 447 A.2d 525.
The interests of justice strongly militate in favor of a remand to the Law Division for further exploration of the facts and development of the record. While we have found no reported New Jersey decision dealing with the precise issue presented, the courts of other jurisdictions faced with similar problems have required evidentiary hearings to determine the likelihood of prejudice emanating from the relationship between the defendant's attorney and the prosecutor. See, e.g. People v. Jackson, 167 Cal.App.3d 829, 832, 213 Cal.Rptr. 521, 522 (1985) (sustained dating relationship between defense counsel and prosecutor constituted conflict requiring reversal of conviction); Commonwealth v. Croken, 432 Mass. 266, 269, 733 N.E.2d 1005, 1013 (2000) (evidentiary hearing was warranted to determine whether attorney-client relationship was impaired by personal relationship between defense counsel and prosecutor); State v. Kelley, 20 S.W.3d 147, 154 (Tex.Ct.App.2000) (familial relationship between trial counsel and assistant prosecutor found not to have impaired defendant's right to the effective assistance of an attorney). That course is mandated here.
Relevant to the Law Division's inquiry are three opinions rendered by the Supreme Court's Advisory Committee on Professional Ethics. In Opinion 191, 94 N.J.L.J. 225 (1971), the Committee decided that when a father and two sons practiced law together, and one of the sons was appointed prosecutor, the remaining members of the firm could no longer practice criminal law in that county. In Opinion 201, 94 N.J.L.J. 225 (1971), the Committee precluded the former partner of an assistant prosecutor from practicing criminal law in the same county. More recently, in Opinion 599, 119 N.J.L.J. 632 (1987), the Committee permitted the father and brother of an assistant prosecutor to practice criminal law in the same county. The Committee distinguished its prior opinions by noting that the assistant prosecutor had never practiced with either his father or brother, and all lived in separate households. In this case, the trial court should determine whether defendant's trial attorney and his daughter had ever practiced law together and whether they resided in different households at the time of the trial and related criminal proceedings.
The trial court should also determine whether defense counsel apprised defendant of his relationship and, if not, whether defendant otherwise became aware of it. One additional circumstance deserves attention. Rule of Professional Conduct 1.8 *1162 provides that "[a] lawyer related to another lawyer as parent, child, sibling or spouse shall not represent a client in a representation directly adverse to a person who the lawyer knows is represented by the other lawyer except upon consent by the client after consultation regarding the relationship." Although the record is not wholly informative on the question, it appears that this Rule was not violated because trial counsel's daughter apparently played no part in the prosecution of defendant. However, much depends on the structure of the Passaic County Prosecutor's Office and the extent to which counsel's daughter was a part of the prosecutorial decisionmaking process. These are some of the factual issues that should be explored on remand.
We add the following comments before leaving the subject. The problem we face here should not recur. When a defense attorney is faced with a possible conflict of interest in representing his client, he should notify the trial court of the potential problem at the earliest possible time. The trial court should conduct a hearing on the record to determine whether a conflict of interest exists. The defendant should be present at the hearing. Depending upon the relevant facts, the defendant should be apprised of the potential problems and pitfalls pertaining to the potential conflict. Specifically, counsel involved in a potential conflict situation such as the one disclosed here should not proceed with the defense without first explaining fully to the accused the nature of the alleged contaminating relationship. The prosecution should be required to explain how the assistant prosecutor who is related to the defense attorney will be shielded from having any decisionmaking ability in the case. Such arrangements should be described in detail. The defendant, if he so desires, should be afforded the opportunity to secure counsel unencumbered by potential divided loyalties. A defendant may surrender his right to independent counsel. State v. Bellucci, 81 N.J. at 544, 410 A.2d 666. However, the trial court should ensure that the waiver is voluntarily and intelligently made on the record. Ibid. (citing State v. Land, 73 N.J. at 34, 372 A.2d 297).
Defendant is also entitled to an evidentiary hearing on his claim that trial counsel usurped his decision whether or not to testify. Defendant contends that his attorney never apprised him of his right to take the stand, but instead simply directed him not to testify. In State v. Savage, 120 N.J. 594, 577 A.2d 455 (1990), our Supreme Court emphasized that "it is the responsibility of a defendant's counsel, not the trial judge, to advise defendant on whether or not to testify and to explain the tactical advantages or disadvantages [of] doing so or not doing so." Id. at 630, 577 A.2d 455. The Court explained that "[c]ounsel's responsibility includes advising a defendant of the benefits inherent in exercising that right and the consequences inherent in waiving it." Id. at 631, 577 A.2d 455. The decision whether or not to testify ultimately rests with defendant in consultation with his lawyer. State v. Bey, 161 N.J. at 269, 736 A.2d 469. On remand, defendant should be required to file an affidavit pinpointing his claim that his attorney was ineffective in failing to apprise him of his options. Assuming a prima facie case of ineffectiveness is presented, defendant is entitled to an evidentiary hearing. State v. Preciose, 129 N.J. 451, 462-64, 609 A.2d 1280 (1992).
The same procedure should be followed with respect to defendant's remaining claims of ineffectiveness. Defendant should be required to provide factual support in an affidavit concerning his contention that counsel failed to consult with him, State v. Savage, 120 N.J. at 615-17, 577 A.2d 455, failed to interview key State's witnesses, State v. Preciose, 129 N.J. at 463, 609 A.2d 1280, and failed adequately to investigate the possibility of an intervening cause of Ferguson's death, ibid. If the facts so presented establish a prima facie case of ineffectiveness, defendant should be afforded an evidentiary hearing.

*1163 IV.
Defendant's remaining arguments clearly lack merit. R. 2:11-3(e)(2). We need comment only on defendant's claims that (1) the trial was tainted by prosecutorial misconduct, (2) he was prejudiced by the trial court's failure to charge the jury on the statutory defense to felony murder, and (3) plain error was committed in the trial court's instructions on accomplice liability.
We are entirely satisfied that defendant was not prejudiced by the prosecutor's conduct of the trial. However, our disposition of this issue does not constitute a blanket endorsement of the prosecutor's methods. The prosecutor improperly referred to defendant and Abdul as "thugs" during his direct examination of Ayoub. Such derogatory name-calling is beneath the dignity of the prosecutor, and has often been disapproved by the Supreme Court, see, e.g., State v. Clausell, 121 N.J. 298, 341-42, 580 A.2d 221 (1990) (prosecutor improperly described defendant as a "maniac"); State v. Pennington, 119 N.J. 547, 577, 575 A.2d 816 (1990) (prosecutor's reference to defendant as a "coward," "liar," and "jackal" were improper), and this court, see, e.g., State v. Gregg, 278 N.J.Super. 182, 189, 650 A.2d 835 (App.Div.1994), certif. denied, 140 N .J. 277, 658 A.2d 300 (1995) (prosecutor erred when he characterized the defendant as "a ninny," "a buffoon," and a "violent" criminal); State v. Stewart, 162 N.J.Super. 96, 102-03, 392 A.2d 234 (App.Div.1978) (prosecutor improperly referred to the defendant as a "young punk"); State v. Von Atzinger, 81 N.J.Super. 509, 516, 196 A.2d 241 (App.Div.1963) (prosecutor improperly described the defendant as a "bum," "hood," and "punk"). The trial court's prompt intervention and curative charge nevertheless obviated any potential for undue prejudice.
The prosecutor also erred in his summation when he suggested that the trial judge endorsed the testimony of the State's expert, Dr. Perez. The judge's preliminary finding that Perez was qualified to offer an opinion concerning the cause of Ferguson's death obviously did not constitute an endorsement of the witness's testimony. The prosecutor's suggestion that the judge vouched for the credibility of the expert was factually incorrect and highly improper. We nevertheless find no prejudice flowing from this brief and isolated incident. At the time that the judge found Perez to be qualified, he specifically told the jury that it was not bound by the witness's opinion testimony and that it could reject it if it wished. This charge was essentially repeated in the judge's instructions at the conclusion of the case.
We also reject defendant's argument that the trial court erred by failing to instruct the jury of the statutory defense to felony murder set forth in N.J.S.A. 2C:11-3a(3). That statute reads in pertinent part:
[I]t is an affirmative defense that the defendant:
(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and
(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and
(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and
(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.
The evidence did not support the thesis that defendant was not a direct participant in the commission of the homicidal act. Beyond this, defendant did not submit a request to charge on the subject. Nor did he interpose a timely objection to the instructions given. To the contrary, during *1164 the charge conference, the defendant's attorney acceded to the trial court's decision to charge the statutory defense as to Abdul, but not as to defendant. The error belatedly claimed here did not have the capacity to lead to an unjust result. R. 2:10-2. Nor was the alleged error of such moment as to "`cut mortally into the substantive rights of the defendant[ ].'" State v. Corsaro, 107 N.J. 339, 341, 526 A.2d 1046 (1987) (quoting State v. Harper, 128 N.J.Super. 270, 277, 319 A.2d 771 (App. Div.), certif. denied, 65 N.J. 574, 325 A.2d 708 (1974)).
Finally, we are unpersuaded by defendant's claim that the trial court's charge on accomplice liability constituted plain error. The trial of this case took place before our decision in State v. Bielkiewicz, 267 N.J.Super. 520, 528, 632 A.2d 277 (App.Div.1993) was rendered. Using the Model Charge in effect at the time, the trial court told the jury that "one cannot be held to be an accomplice unless [it is found] that he possessed the same criminal state of mind that is required to be proved against the person who actually committed the criminal act." This was the instruction we criticized in Bielkiewicz. We are nonetheless satisfied that the error was not harmful because the evidence was overwhelming that defendant harbored the requisite mens rea necessary to establish felony murder. See State v. Norman, 151 N.J. at 38, 697 A.2d 511; State v. Eure, 304 N.J.Super. 469, 472, 701 A.2d 464 (App.Div.), certif. denied, 152 N.J. 193, 704 A.2d 23 (1997); State v. Rue, 296 N.J.Super. 108, 115, 686 A.2d 348 (App.Div.1996), certif. denied, 148 N.J. 463, 690 A.2d 611 (1997). Moreover, the trial court instructed the jury that it was to consider "[e]ach offense and each defendant... separately." We are satisfied that defendant was not prejudiced. See State v. Scherzer, 301 N.J.Super. 363, 475, 694 A.2d 196 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997).
The conviction is accordingly affirmed. The matter is remanded to the Law Division for proceedings consistent with this opinion. We do not retain jurisdiction.