**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0040-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DENNIS THIGPEN, JR.,

     Defendant-Appellant.

_____

Submitted November 1, 2021 – Decided December 14, 2021

Before Judges Accurso and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 10-07-1359.

Joseph E. Krakora, Public Defender, attorney for appellant (James D. O'Kelly, Designated Counsel, on the briefs).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel Marzarella, Chief Appellate Attorney, of counsel; Shiraz Deen, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Dennis Thigpen, Jr. appeals from the August 1, 2019 order denying his petition for post-conviction relief (PCR) without an evidentiary hearing.  We affirm.

I.

A jury convicted defendant of first-degree conspiracy to commit murder, N.J.S.A. 2C:11-3(a) and N.J.S.A. 2C:5-2, and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b).  The jury was hung on the remaining charges of murder and possession of a gun for an unlawful purpose, N.J.S.A. 2C:39-4(a).  Defendant was tried twice more and each time the jury deadlocked.  The trial court dismissed the two outstanding charges at the State's request.

The State theorized that eighteen-year-old Anthony Skyers was murdered because the Bloods street gang believed he "snitched" on their second-highest ranking member, Dyshon Ragland,[1] and told the police Ragland committed an armed robbery at a restaurant in Tom River.  The State produced multiple witnesses at trial to support its theory, including Ragland's girlfriend, Z.J.  During defendant's first trial in 2010, Z.J. testified that on the evening of June

---

[1]  Ragland was tried separately, convicted of Skyers's murder and related offenses, and sentenced to a forty-five-year prison term.

A-0040-19

5, 2008, she and Ragland were at her apartment in High Point when Ragland received "between five to seven phone calls." Ragland appeared upset by the calls and told Z.J., referring to Skyers, "I hope he didn't do what I think he did, because if he did, I'm going to have to shut him up." Z.J. also stated a fellow Bloods member, C.B., arrived at the apartment that night, the two men left the apartment together, and Ragland returned alone to the apartment around 1:00 in the morning.

According to Z.J., five minutes after Ragland came home, defendant arrived at the apartment and his "eyes were big like in shock" and he was "very sweaty." Z.J. stated defendant looked "[k]ind of upset" but more "frightened." When she asked defendant why he "look[ed] like he killed someone," defendant did not answer. He and Ragland went into the bathroom together, shut the door and talked with the water running, but Z.J. could not hear what was said. Later that morning, Skyers was found dead in the woods behind the High Point apartment complex. He had two gunshot wounds in the back of his head.

The State also called defendant's former roommate, J.V., to testify. J.V. stated that defendant told her

> he lured [Skyers] to the woods and told [Skyers] to walk up ahead of him and he shot [Skyers]. The first time the safety was on the gun, it didn't go off and [Skyers] turned around and said what are you doing?

3

A-0040-19

[Defendant] said, I'm just kidding, go ahead. And then [Skyers] turned around and [defendant] shot him again.

According to J.V., defendant said that before the murder, Bloods members were discussing who would kill Skyers and defendant "was the only one that had the balls to do it." She also stated that defendant bragged: "I killed the kid, I could do it again, it's nothing to kill somebody."

More than a year after the murder, C.B. and his cousin, B.N., also a Bloods member, were arrested for multiple counts of unrelated armed robberies. Detective Gregory Staffordsmith interviewed both men on July 6, 2009, and each implicated defendant in Skyers's murder. The following day, defendant was arrested based on Staffordsmith's probable cause affidavit.

The detective's affidavit included statements attributable to C.B. and B.N. For example, it referred to C.B.'s statements that: Ragland invited him to his apartment shortly after the murder; Ragland told him he murdered Skyers and that defendant was present; and C.B. subsequently spoke with defendant, who told him that "Ragland had ordered Skyers['s] murder because Skyers had 'snitched' to the police about Ragland's involvement in the [r]obbery of the Subway in Toms River . . . on February 27, 2008[.]"

Additionally, the affidavit referenced B.N.'s statements that: C.B. contacted him early on June 6, 2008 to advise that Ragland and another unknown

4

male took C.B. to a wooded area behind Ragland's apartment complex to show him the dead body of Anthony Skyers; and during that meeting, Ragland told C.B. he murdered Skyers.

Pertinent to this appeal, the State admits Staffordsmith's affidavit also contained three statements which were partially incorrect. The phrases comprising the admitted misstatements are underscored: (1) "Mr. Ragland and [defendant] then took [C.B.] in [the] wooded area behind the High Point Apartments and showed [C.B.] the dead body of Anthony Skyers"; (2) "[defendant] . . . told [B.N.] that he had murdered Anthony Skyers on the orders of Dyshon Ragland"; and (3) "[defendant] advised [C.B.] that he had murdered Skyers on the orders of Dyshon Ragland." (Emphasis added).

The State called C.B. and B.N. to testify during defendant's first trial and their testimony was consistent with the unchallenged portions of Staffordsmith's probable cause affidavit. For example, C.B. stated that Ragland ordered him to go to Ragland's apartment after the murder, and that Ragland took him to the woods behind the apartment complex to show him Skyers's corpse. C.B. also testified that Ragland told him he "killed [Skyers]," that "[Skyers] had to go," and "this is what happens when somebody snitches."

A-0040-19

Additionally, C.B. stated that before the murder, defendant was trying to join the Bloods, and by the fall of 2008, he was a new member of the gang. Defendant immediately held a high-ranking position, which was unusual because new members usually start at a low-level position and work their way up by committing crimes. Defendant told some Bloods members that he gained his high rank because he killed Skyers. C.B. stated that defendant also talked about the murder a second time while he, defendant and other Bloods members were riding in a car on their way to Newark.

B.N. testified that approximately a year after the murder, defendant told him, "the way [defendant] was raised, when people snitch on you, you got to handle that." B.N. asked defendant if he was talking about Skyers and defendant responded, "yeah." Defendant also told B.N. that defendant achieved his rank in the Bloods because of "the whole thing with [Skyers]."

6

In anticipation of a retrial, defendant moved to suppress evidence resulting from Staffordsmith's probable cause affidavit, pursuant to Franks v. Delaware, 438 U.S. 154 (1978).[2] The motion was denied in June 2011.[3]

Because defense counsel was disbarred after the first trial, successor counsel assumed defendant's representation. Defendant's new attorney moved to suppress the statements B.N. and C.B. gave to Staffordsmith during their 2009 interviews. He submitted a certification with the motion in January 2012, stating "the representations made by Det. Gregory Staffordsmith . . . . were misleading and incomplete." But counsel's certification did not specify which representations in the probable cause affidavit were "misleading and incomplete." The suppression motion was denied on June 14, 2012.[4]

---

[2] A Franks hearing is required only "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." Franks, 438 U.S. at 171.

[3] Defendant did not provide a transcript from the motion hearing or other documentation from this motion to the PCR judge. Also, although neither party was able to find the trial court's 2011 decision, the State provided the PCR judge with a Promis/Gavel print out to establish the motion was denied.

[4] Again, no transcript of the 2012 hearing was supplied to the PCR judge or to us.

A-0040-19

Less than two weeks later, Staffordsmith was called by the defense to testify at the second trial.[5] During defense counsel's examination, Staffordsmith admitted his probable cause affidavit contained an error. Specifically, he acknowledged the words, "and [defendant]" should not have been included in the following statement attributed to C.B.: "Mr. Ragland and [defendant] then took [C.B.] in [a] wooded area behind the High Point Apartments and showed [C.B.] the dead body of Anthony Skyers." While on the stand, Staffordsmith also denied he "put something in [the affidavit] knowing[] that it was wrong[,]" explaining he "wasn't aware there was a mistake at the time[.]" Further, the detective stated he did not alert the assistant prosecutor who handled the case to the error. According to Staffordsmith's testimony, the mistake was "later corrected[.]" The record does not reveal when or how the correction occurred.

Based on the limited record before us, it appears that only when defendant stood trial for a third time in 2013 did Staffordsmith admit to the two remaining misstatements in his probable cause affidavit, i.e., that defendant "advised [C.B.] that he had murdered Skyers <u>on the orders of Dyshon Ragland</u>" and that defendant "told [B.N.] that he had murdered Anthony Skyers <u>on the orders of Dyson Ragland</u>." (Emphasis added). An excerpt of the trial transcript reveals

---

[5] Staffordsmith was not called by either party to testify at defendant's first trial.

A-0040-19

that when defense counsel asked Staffordsmith about these misstatements, Staffordsmith asked for clarification. Specifically, the detective inquired, "is your question whether or not your client shot [Skyers] or was he ordered to shoot him?" Defense counsel responded, "[o]rdered to shoot him." Staffordsmith replied that there was "nothing specific about an order to shoot [Skyers]" and that it was a mistake for the affidavit to read that either C.B. or B.N. told him defendant "was ordered to [shoot Skyers] by . . . Ragland." Critically, however, Staffordsmith did not testify he made a mistake by swearing C.B. and B.N. told him defendant "had murdered Anthony Skyers."

Following defendant's third trial, the court sentenced defendant to an aggregate prison term of seventeen years with an eighty-five percent parole disqualifier pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. We affirmed his convictions and sentence on direct appeal.[6] State v. Thigpen, No. A-2490-14T2 (App. Div. Aug. 11, 2017). In 2018, the Supreme Court denied certification. State v. Thigpen, 232 N.J. 146 (2018).

---

[6] We also remanded for the limited purpose of correcting a typographical error in the judgment of conviction.

A-0040-19

## II.

In February 2018, defendant filed a timely pro se PCR petition. He argued his first trial attorney provided ineffective assistance of counsel, and that he was convicted based on police and prosecutorial misconduct, as well as various Fourteenth Amendment violations. After PCR counsel was appointed, he supplemented defendant's petition, arguing that defendant's first trial counsel was ineffective for failing to: "seek to dismiss the [i]ndictment[,]" given Staffordsmith's flawed affidavit; request a hearing to address Staffordsmith's misstatements; "conduct a proper investigation," which "at a bare minimum," would have included "interviewing potential witnesses"; call Staffordsmith to testify; and uncover the two misstatements successor counsel later discovered. Moreover, PCR counsel contended that even if each of his first attorney's errors individually did not deprive him of the effective assistance of counsel, cumulatively, they did. Lastly, PCR counsel argued appellate counsel was ineffective for failing to "properly raise [the] issues asserted herein that could have been raised on appeal."

The PCR judge heard argument on defendant's PCR petition in July 2019, at which time defendant briefly addressed the court. Thereafter, defendant submitted a handwritten letter to the judge, which was considered without

objection from either party. On August 1, 2019, the judge denied the petition without an evidentiary hearing.

The PCR judge concluded that defendant's claims about Staffordsmith's affidavit were procedurally barred under Rules 3:22-4 and -5. He reasoned that defendant had twice moved to suppress evidence based on the misstatements in Staffordsmith's affidavit, and then failed to challenge the denial of the motions on direct appeal.

The judge also found defendant "failed to show a prima facie case of ineffective assistance of trial or appellate counsel." He specifically rejected the notion that the post-trial disbarment of defendant's first attorney, without more, demonstrated defendant received ineffective assistance of counsel. Indeed, the judge found defendant failed to show "how his counsel's disbarment post-trial had any effect on the proceedings." Moreover, the judge stated that his review of the trial transcript showed defendant's first attorney was "engaged, zealous and motivated[,]" and that the transcript "belie[d] any claim that trial counsel was inattentive, unprepared or ineffective." Additionally, the judge concluded defendant was properly counseled about his right to testify during the first trial. The judge noted that at his first trial, defendant was asked if he had a "full and fair opportunity to make [the] decision" about testifying and "underst[ood] all

[his] options," and defendant "answered, 'Yes, sir' to both questions." Accordingly, the judge found defendant was "informed thoroughly on the advantages and disadvantages of testifying in court" and "intelligently exercised his constitutional right to remain silent."

Further, the judge declined to find defendant's first attorney was ineffective for failing to call Staffordsmith as a witness, concluding counsel's decision not to call the detective demonstrated "sound strategy" because "calling a hostile witness" to highlight an incorrect statement in an affidavit would have allowed the State to cross-examine the detective, and "elicit testimony harmful to [defendant]." Additionally, the judge found there was no merit to defendant's claim that trial counsel was ineffective for failing to move to dismiss the indictment, particularly given that successor counsel was unsuccessful when he moved to dismiss the indictment.

Similarly, the judge rejected defendant's argument that the State committed prosecutorial misconduct by relying heavily on hearsay testimony during grand jury proceedings. The judge noted that defendant "relie[d] upon outdated case law" to challenge the propriety of the grand jury proceedings.

Regarding defendant's contention that his appellate counsel was ineffective, again, the judge was not persuaded. The judge found that although

A-0040-19

defendant argued "[a]ppellate counsel failed to properly raise those issues asserted herein that could have been raised on direct appeal," PCR counsel neglected "to . . . address what issues appellate counsel allegedly failed to raise."

III.

On appeal, defendant presents the following arguments:

POINT I

THE PCR COURT'S LEGAL AND FACTUAL CONCLUSIONS CONCERNING THE PCR CLAIMS [DEFENDANT] MADE ABOUT THE STAFFORDSMITH AFFIDAVIT WERE PATENTLY ERRONEOUS AND BASED ON AN INADEQUATE PCR RECORD AND SPECULATIVE ARGUMENTS MADE BY THE STATE.

A. [Defendant's] Claims Concerning The Staffordsmith Affidavit Were Not Procedurally Barred Pursuant to [Rule] 3:22-5 Because No Court Has Ever Adjudicated The Issue Of Whether Suppression Was Required Due To All Of The Misrepresentations In The Affidavit.

B. The PCR Court Erred In Concluding That [Defendant's] Claims Concerning The Erroneous Statements In The Staffordsmith Affidavit Were Procedurally Barred Because A Second Motion To Suppress Had Been Filed Prior To [Defendant's] Third Trial.

C. The Trial Court Erred In Concluding That [Defendant] Was Not Entitled To [PCR] Because The Issue Of The Numerous Misstatements In The Staffordsmith Affidavit Should Have Been Raised On Direct Appeal.

13

POINT II

THE PCR COURT FAILED TO CONSIDER AND RESOLVE [DEFENDANT'S] PRO SE CLAIMS FOR [PCR].  (Not Raised Below).

POINT III

THIS MATTER SHOULD BE REMANDED BECAUSE PCR COUNSEL'S LEGAL REPRESENTATION FELL BELOW THE PROFESSIONAL STANDARD REQUIRED BY [RULE] 3: 22-6 (d).  (Not Raised Below).

In his reply brief, defendant raises the following additional argument:

AT THE PCR LEVEL, THE STATE OF NEW JERSEY MADE AN ERRONEOUS REPRESENTATION THAT WAS ULTIMATELY RELIED ON BY THE PCR COURT TO DENY [DEFENDANT PCR]. INSTEAD OF ACKNOWLEDGING THIS ESTABLISHED FACT, THE STATE NOW OFFERS SPECULATIVE ARGUMENTS IN AN ATTEMPT TO SHIELD THE STAFFORDSMITH AFFIDAVIT FROM ADDITIONAL JUDICIAL SCRUTINY.

We review a PCR court's legal conclusions de novo, but generally defer to its fact-findings when those findings are "supported by adequate, substantial and credible evidence."  State v. Harris, 181 N.J. 391, 415 (2004) (quoting Toll Bros. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)).  If a PCR court does not hold an evidentiary hearing, we "may exercise de novo review over the

14

factual inferences drawn from the documentary record."  Id. at 421 (emphasis in original).

"A PCR petition is not a substitute for raising a claim on direct appeal."  State v. Hess, 207 N.J. 123, 145 (2011); see also R. 3:22-3.  Unless one of "the prescribed exceptions" apply, claims that could have been, but were not, raised in prior proceedings cannot be asserted on PCR.  State v. Preciose, 129 N.J. 451, 476 (1992).  But defendants "are rarely barred from raising ineffective-assistance-of-counsel claims on [PCR]."  Id. at 459-60.  These claims are generally best suited for PCR petitions and "often cannot reasonably be raised in a prior proceeding" given that they "involve allegations and evidence . . . outside the trial record."  Id. at 460.  However, under Rule 3:22-5, "[a] prior adjudication upon the merits of any ground for relief is conclusive whether made in the proceedings resulting in the conviction or in any post-conviction proceeding brought pursuant to this rule or prior to the adoption thereof, or in any appeal taken from such proceedings."

To succeed on a claim of ineffective assistance, a defendant must establish, first, that "counsel's representation fell below an objective standard of reasonableness" and, second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).  A defendant must do more than demonstrate that an alleged error might have "had some conceivable effect on the outcome of the trial."  State v. Sheika, 337 N.J. Super. 228, 242 (App. Div. 2001).  A defendant must prove the error is so serious as to undermine the court's confidence that the "defendant's trial was fair, and that the jury properly convicted him."  State v. Pierre, 223 N.J. 560, 588 (2015).

There is no question but that a defendant's "right to effective assistance includes the right to the effective assistance of appellate counsel on direct appeal."  State v. O'Neil, 219 N.J. 598, 610-11 (2014).  But appellate counsel need not advance every argument a defendant urges, even if non-frivolous. Jones v. Barnes, 463 U.S. 745, 750-54 (1983).

Further, the right to the effective assistance of counsel extends to PCR counsel.  See State v. Rue, 175 N.J. 1, 18-19 (2002).  PCR counsel must "advance all of the legitimate arguments requested by the defendant that the record will support, "Rule 3:22-6(d), and "make the best available arguments in support of them," Rue, 175 N.J. at 19.  Even if PCR counsel deems the claims to be meritless, counsel must "list such claims in the petition or amended petition or incorporate them by reference."  R. 3:22-6(d); see also State v. Webster, 187 N.J. 254, 257-58 (2006).  Like ineffective assistance of counsel claims against

16

trial counsel, the resolution of claims against PCR counsel routinely involves matters outside the record. Thus, an ineffective assistance of counsel claim against PCR counsel is typically raised in a second or subsequent PCR petition. See State v. Armour, 446 N.J. Super. 295, 317 (App. Div. 2016); see also R. 3:22-12(a)(2)(C).

Mindful of these principles, we first address defendant's Point I arguments, which collectively challenge the PCR judge's finding that defendant's ineffective assistance claims about the misstatements in Staffordsmith's affidavit were barred under Rules 3:22-4 and -5. We disagree with the PCR judge that defendant's ineffective assistance of counsel claims were procedurally barred. Because the ineffective assistance claims raised in defendant's PCR petition involved alleged legal errors not contained completely within the trial record, they were not ripe for appellate review. See Preciose, 129 N.J. at 460. In fact, defendant's claims were better suited for a PCR proceeding because, as the PCR judge recognized, at least some of the issues defendant raised concerned trial strategy decisions. See State v. McDonald, 211 N.J. 4, 30 (2012). Additionally, given the partial record before us, as well as defendant's assertions about when Staffordsmith's misstatements were discovered, we are not convinced defendant's contentions regarding the

A-0040-19

probable cause affidavit were barred under Rule 3:22-5.[7] Nonetheless, we are persuaded defendant's ineffective assistance of counsel claims lack merit and that the judge properly denied his petition without an evidentiary hearing.

The mere raising of an ineffective assistance claim on PCR does not entitle a defendant to an evidentiary hearing. State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). Trial courts should grant evidentiary hearings and make a determination on the merits only if the defendant has presented a prima facie claim of ineffective assistance, material issues of disputed facts lie outside the record, and resolution of the issues necessitates a hearing. R. 3:22-10(b); State v. Porter, 216 N.J. 343, 355 (2013).

Here, we are satisfied defendant did not establish a prima facie claim of ineffective assistance of trial or appellate counsel because he did not satisfy the prejudice prong under Strickland. Stated differently, defendant failed to establish "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland, 466 U.S. at 687-88, particularly given that the State produced strong evidence of

---

[7] To the extent defendant attempted to raise substantive contentions relating to the Staffordmith affidavit in his PCR petition, such as prosecutorial misconduct, we would agree such claims are barred under Rule 3:22-4, because they could have been brought on direct appeal. See State v. Quezada, 402 N.J. Super. 277, 280 (App. Div. 2008).

A-0040-19

defendant's guilt through testimonial evidence. Accordingly, we need not address whether counsel's performance was deficient. See State v. Gaitan, 209 N.J. 339, 350 (2012) (citations omitted) ("Although a demonstration of prejudice constitutes the second part of the Strickland analysis, courts are permitted leeway to choose to examine first whether a defendant has been prejudiced, and if not, to dismiss the claim without determining whether counsel's performance was constitutionally deficient.").

We reach this conclusion because although defendant seeks relief based on Staffordsmith's affidavit, the record demonstrates that even if the three misstatements we have discussed were excised from the affidavit, the police still had probable cause to arrest him. See State v. Howery, 80 N.J. 563, 568 (1979). In fact, the balance of the affidavit included statements from C.B. and B.N. that: defendant confessed to murdering Skyers (albeit without saying he was ordered by Ragland to do so); C.B. was told by Ragland that defendant "was present" for the murder; and defendant told C.B. that Ragland ordered Skyers's murder because Skyers had "snitched" to the police about Ragland's involvement in a robbery.

19

Similarly, defendant failed to show how he was prejudiced by appellate counsel's purported errors. As the PCR judge aptly noted, PCR counsel neglected "to . . . address what issues appellate counsel allegedly failed to raise."

Regarding Point II, defendant newly argues the PCR judge failed to address each claim he raised in his pro se petition, despite that "PCR counsel properly incorporated [defendant's] pro se claims in his petition brief." Again, we are not convinced. Instead, our review of the certification accompanying defendant's pro se petition persuades us the judge addressed each of the claims raised in defendant's certification.

We also note defendant provided the following response in his pro se petition where he was directed to "state with specificity the facts upon which the [PCR] claim for relief is based, legal arguments and all claims": "Newly Discovered Evidence, Evidence hearing, Prosecutorial misconduct, and violated my [Fourteenth] [A]mendment[] right, and Frank [v.] Delaware hearing, and [p]olice misconduct, Ineffective Counsel on [my first trial attorney]." From this abbreviated list of claims, defendant contends that "[l]eft unaddressed in the PCR court's written opinion were [defendant's] claims of newly discovered evidence, 'evidence hearing,' [Fourteenth] Amendment violation and police misconduct." But defendant does not explain how his vaguely worded

arguments were tethered to the facts of his case. Under these circumstances, it was not the role of the PCR judge, nor is it the role of this court, to weave together the fabric of an argument on defendant's behalf.

Finally, we decline to address the arguments raised in Point III because we are convinced the remedy for PCR counsel's purported failures to provide effective assistance of counsel is a new PCR proceeding. See R. 3:22-4(b)(2)(C) (a timely second PCR application will not be dismissed so long as it "alleges a prima facie case of ineffective assistance of counsel that represented the defendant on the first or subsequent application for [PCR]"). We reach this conclusion because proof of any alleged errors of PCR counsel currently lies outside this record. See Preciose, 129 N.J. at 460.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in our written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21                                                    A-0040-19