# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3743-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALLEN HARBATUK,

     Defendant-Appellant.

_____

Submitted January 24, 2022 – Decided February 14, 2022

Before Judges Sumners and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 15-04-0679.

Joseph E. Krakora, Public Defender, attorney for appellant (Christopher W. Hsieh, Designated Counsel, on the brief).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel Marzarella, Chief Appellate Attorney, of counsel; Shiraz Deen, Assistant Prosecutor, on the brief).

PER CURIAM

Following a jury trial, defendant Allen Harbatuk was convicted of second-degree sexual assault, in violation of N.J.S.A. 2C:14-2(c)(4), committed upon the victim, D.U.,[1] a minor. Defendant was sentenced to a seven-year term of imprisonment; Megan's law registration, N.J.S.A. 2C:7-1 to -19; parole supervision for life (PSL), N.J.S.A. 2C:43-6.4; and the requisite fines and penalties were imposed.

The conviction stemmed from a sexual relationship defendant and his husband, Raymond Waters, had with D.U. when he was between the ages of fourteen to seventeen years old. The victim was a student of Waters. The State arrested and charged Waters first with sexual assault. Defendant was later charged following his inculpatory statement to the police after he waived his Miranda[2] rights and the execution of a search warrant, which uncovered incriminating letters and photographs.

Defendant now appeals from his conviction and sentence, raising the following points for our consideration:

---

[1] We use initials to protect the identity of the victim and to preserve the confidentiality of these proceedings. R. 1:38-3(c)(12).

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

POINT I

DEFENDANT'S STATEMENT WAS TAKEN IN VIOLATION OF HIS CONSTITUTIONAL RIGHT TO SILENCE AND RIGHT TO COUNSEL, AS THE POLICE UNLAWFULLY INTERROGATED DEFENDANT AFTER HE HAD ADVISED THAT HE DID NOT WANT TO SPEAK WITH THEM AND WANTED HIS ATTORNEY.

POINT II

DEFENDANT'S STATEMENT WAS INVOLUNTARY AND TAKEN IN VIOLATION OF HIS DUE PROCESS RIGHTS, AS THE POLICE MADE FALSE PROMISES OF LENIENCY THAT OVERBORE DEFENDANT'S WILL AND SUBVERTED HIS MIRANDA RIGHTS. (Not raised below).

POINT III

THE PRIOR BAD ACT ALLEGATION REGARDING STUDENT KNOWN AS C.J. LACKED PROBATIVE VALUE, WAS UNDULY PREJUDICIAL, AND SHOULD HAVE BEEN EXCLUDED FROM EVIDENCE SUA SPONTE. THE ERRONEOUS ADMISSION OF SUCH EVIDENCE AND THE ABSENCE OF A LIMITING INSTRUCTION VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL. (Not raised below).

POINT IV

THE PHOTOGRAPHS DEPICTING UNCLOTHED MALE ALLEGED TO BE DEFENDANT LACKED PROBATIVE VALUE UNDER [RULE] 401 AND WERE UNDULY PREJUDICIAL UNDER [RULE]

3

403. THE TRIAL COURT'S FAILURE TO SUA SPONTE EXCLUDE THIS EVIDENCE VIOLATED DEFENDANT'S RIGHT TO A FAIR TRIAL. (Not raised below).

POINT V

THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE. THE TRIAL COURT'S APPLICATION OF AGGRAVATING FACTORS [THREE], RISK OF REOFFENSE, AND [NINE], DETERRENCE, WAS NOT SUPPORTED BY THE RECORD, AS DEFENDANT WAS [SEVENTY-TWO] YEARS OF AGE AT THE TIME OF SENTENCE AND THE COURT ACKNOWLEDGED THAT HIS CONDUCT WAS THE RESULT OF CIRCUMSTANCES UNLIKELY TO RECUR.

After considering the arguments in light of the record and applicable law, we affirm.

I.

We summarize the facts from the trial record to give context to the issues raised on appeal. In 2000, defendant and Waters began dating. In September 2002, Waters and D.U. first met when Waters was employed as an art teacher at Toms River High School North and D.U. was a student in Waters's freshman year art class. D.U. was fourteen years old at the time. Soon thereafter, Waters and D.U. developed a close relationship. Waters "played chess with D.U., ate lunch with him, helped with his homework, gave him rides to school and to the

4

gym, and bought him gifts."  Eventually, Waters and D.U.'s relationship "developed into a sexual one."[3]

Defendant and D.U. first met in January 2003 after being introduced by Waters.  At the time, Waters told D.U. defendant was his "friend" whom he lived with.[4]  In spring of 2003, Waters invited D.U. to the couple's home to spend the weekend there and assist them with their landscaping.  On D.U.'s first visit to the couple's home, he had sexual relations with defendant for the first time.  Throughout the remainder of his freshman year of high school and the summer of 2003, D.U. continued to visit defendant and Waters on weekends and "the three of them would engage in sexual encounters."  During the summer months that year, D.U. assisted the couple at the Boy Scout camp where they were

---

[3]  The record does not reflect the date when Waters and D.U.'s relationship first "developed into a sexual one."  The record is unclear as to whether D.U. was fourteen or fifteen years old when the relationship developed.  However, D.U. testified:  (1) his birthday is in October; (2) he began his freshman year of high school in September 2002; (3) he first met Waters in his freshman year art class; and (4) D.U. did not spend time alone with Waters for "the first couple of weeks."  As such, although Waters and D.U. first met when D.U. was fourteen years old, the record would suggest that Waters and D.U.'s relationship did not "develop[] into a sexual one" until after D.U. turned fifteen.

[4]  Although defendant refers to Waters as his husband throughout his brief and the record, defendant and Waters were not officially married until October 27, 2013.

employed. Occasionally, D.U. slept in the couple's tent and engaged in oral sex with them several times.

The parties' sexual encounters regularly continued on the weekends until approximately the end of D.U.'s sophomore year.[5] D.U. testified towards the end of his sophomore year, after he had teased Waters, defendant and Waters "said let's show him what rape is." Defendant then restrained D.U. "on the bed while Waters performed anal sex on him. Neither [defendant nor Waters] had penetrated [D.U.] anally before." Thereafter, D.U. ceased visiting the couple, and only visited them once during his junior year. D.U. never visited them again after that.

In 2011, D.U. disclosed, for the first time, his sexual relationship with defendant and Waters "to his drug rehabilitation counselor." But after completing rehab therapy, D.U. continued to keep his sexual encounters with the couple a secret because he "was embarrassed . . . [a]nd it really messed [him] up." In 2013, D.U. told his mother-in-law about his abuse because he "wanted to have some peace of mind." D.U.'s mother-in-law referred D.U. to an attorney who in turn made an appointment for D.U. to speak with the prosecutor's office.

---

[5] After D.U.'s freshman year of high school, Waters was "forced to retire." Consequently, after D.U.'s freshman year, his relationship with the couple was largely limited to his weekend visits.

On January 15, 2014, D.U. met with Detective Jason Steele and informed him of the "sustained period of sexual assault committed by" both defendant and Waters "against D.U. when he was [fourteen to seventeen] years old." D.U. provided Detective Steele with twenty-one "letters and envelopes addressed from Waters and/or [d]efendant to D.U." One envelope, which had defendant's name and address on it, contained a number of photograph prints and negatives depicting "[d]efendant and/or Waters with D.U. in locations such as Waters's art class, the . . . Boy Scout [c]amp, and" the couple's home. "Several of the photos had written dates indicating that D.U. was under [sixteen] at the time they were taken . . . ." Two of the photos depicted defendant nude. D.U. also provided Detective Steele with thirty "postcards[;] various items of clothing[;] ceramic clowns[;] and other such gifts."

On October 22, 2014, at or about 2:30 p.m., Detective Steele and other detectives went to the couple's home to ask defendant "if he'd be willing to come to the . . . [p]olice [d]epartment for an interview." Defendant claims he both rejected the invitation for an interview and informed Detective Steele he wished to speak with his attorney first. Detective Steele testified defendant rejected the invitation but denied defendant requested to speak to his attorney first.

At or about 3:00 p.m., Detective Steele, and other detectives, returned to the couple's home and arrested Waters. Defendant was present and expressed concern regarding Waters's cardiac issues and medications. Detective Steele testified:

> [Defendant] wanted to make sure that if [Waters] had any kind of medical issues, that we would . . . properly bring him to a hospital . . . .
>
> . . . .
>
> . . . At that point[,] . . . [defendant] ask[ed] if he could bring medications down for [Waters], because he . . . was taking numerous medications for [his] medical issues.

Defendant "was told that he could bring [Waters]'s medications to the police station."

At around 3:30 p.m., defendant drove himself to the police station to deliver Waters's medications. Defendant claimed he gave Waters's medications to an officer at a window inside the station and asked why Waters was arrested, but he did not receive an answer. "He was told to sit down and to wait." Thereafter, defendant was escorted "to an interview room and read [his] Miranda rights." At about 3:42 p.m., defendant signed a Miranda waiver form. The police interrogated defendant for approximately two hours, which was videorecorded.

8

In defendant's recorded statement, he initially "did not acknowledge that he or [Waters] had sex with D.U." However, defendant did confirm "substantial portions of D.U.'s account of events, including: (1) [defendant] met D.U. through Waters"; (2) D.U. helped with landscaping at the couple's home; (3) D.U. and Waters would wrestle in bed at the couple's home; and (4) defendant, Waters, and D.U. worked together at the Boy Scout camp. But after another detective entered the interrogation room and informed defendant Waters "had just given 'a full confession,'" defendant "admitted that he and D.U. engaged in oral sex multiple times and anal sex 'maybe once.'" However, defendant claimed he was uncertain of D.U.'s age when they first had sex. At trial, Detective Steele admitted that the officers deceived defendant as Waters had not actually confessed.

On October 24, 2014, a search warrant was executed at the couple's home. The police uncovered photographs of defendant, Waters, and D.U., "as well as a folder with the nickname [d]efendant and Waters used for D.U. written on it." "In the folder, detectives uncovered a signed letter addressed to Auto Strauss Center authorizing a payment of $220.01 from [d]efendant's credit card to D.U., with a note from [d]efendant thanking 'Nancy' for taking care of his 'nephew.'"

9

In addition, the police also uncovered "financial documents reflecting joint financial arrangement[s] between [d]efendant and D.U."

On April 2, 2015, an Ocean County grand jury charged defendant and Waters. Defendant was charged with second-degree sexual assault, in violation of N.J.S.A. 2C:14-2(c)(4). Waters was charged with first-degree aggravated sexual assault, in violation of N.J.S.A. 2C:14-2(a)(2), and second-degree sexual assault, in violation of N.J.S.A. 2C:14-2(c)(3).

At the pre-trial Miranda hearing, the State presented Detective Steele as its sole witness, who testified consistent with his trial testimony. Defendant testified on his own behalf and did not present any other witnesses. On June 16, 2016, the trial court denied defendant's motion to suppress his statements in a written opinion.[6] The trial court held "[d]efendant was properly read his Miranda rights and voluntarily and intelligently waived them." Furthermore, defendant had "signed and initialed a wavier form . . . giving consent for the detectives to interview him." The trial court noted:

> [Defendant]'s recantation of the events that occurred on the stand are not credible. . . .

---

[6] Defendant claims the trial court conducted the Miranda hearing on June 2 and August 4, 2016. As reflected in the record, however, the trial court's order denying defendant's motion to suppress his recorded statements is dated June 16, 2016. The August 4, 2016 Miranda hearing relates to Waters's motion to suppress his statements.

. . . . [Defendant]'s demeanor on the stand was calm but point oriented. . . . Defendant was very evasive on the stand and his testimony was self-serving. When . . . [d]efendant testified on direct he immediately stated what he wanted to say. When asked questions on cross[-]examination, . . . [d]efendant often tried to evade the question or reiterate what he had said on direct. As the [p]rosecutor argued, [defendant] would eventually concede points but it took getting through minute details in order for him to do so. The testimony that . . . [d]efendant offered is the basis to his entire defense to try and exclude his statement. . . . Defendant's statement is a detrimental piece of evidence that if it were excluded, would be greatly beneficial to . . .[d]efendant's case. This gives . . . [d]efendant more of a reason to be less than truthful or to try and evade the cross[-]examination the way he did.

. . . . If . . . [d]efendant truly did ask for an attorney without being read his rights it is even more likely he would have brought that up again when going through the waiver form. The court also agrees with the State that . . . [d]efendant was aware of many of his rights. . . . Defendant knew he did not have to give the detectives his telephone number and refused to do so. [Defendant] is an intelligent man who knew his rights so if he had originally asked for an attorney[,] it is very likely he would have done so again or referenced the initial asking at least once during the interview.

The court also agrees with the State in that even had [defendant] asserted his right to counsel, . . . [d]efendant initiated conversations with the police which would disrupt his request for counsel. . . . [Defendant] conceded after further inquiry on cross[-]examination that he had asked the police where they were taking . . . Waters thereby reinitiating conversations.

11

This initiation of contact is further developed by [defendant] when he drives to the police station of his own volition. [Defendant] could have simply dropped the medication off to an officer there and left. Instead, [defendant] waited several minutes in the waiting area to speak with Detective[] Steele . . . . Because [defendant] was the one who initiated further communication to the police after asking for an attorney, he was no longer protected under Miranda.

Lastly, this court agrees with the State that [defendant] was never in a custodial interrogation to trigger the requirements for Miranda. . . .

. . . . Defendant must be in a custodial interrogation and feel he were not free to leave in order for the requirements of Miranda, to apply. . . . [Defendant] had voluntarily entered the police station of his own accord to speak to the [d]etectives. He was never told he was not free to leave. . . . Defendant was never harassed to stay, he was never placed under arrest before the statement, no weapon was ever drawn, and at most there were only ever two officers in the interrogation room with . . . [d]efendant at one time. . . . Defendant was also never asked to relinquish his cell phone. A few minutes into the interview . . . [d]efendant in fact receives a telephone call and answers it.

On June 12, 2018, defendant's jury trial commenced. At trial, the State introduced into evidence the photographs of defendant, Waters, and D.U., including the two nude photographs of defendant. Additionally, the State introduced "the videotaped statement of [defendant], [which] was played for the jury." After the jury returned the guilty verdict, defendant was sentenced on

12

November 2, 2018. A conforming judgment of conviction (JOC) was entered that day. On January 4, 2019, an amended JOC was entered to: (1) remove the order that defendant is subject to Nicole's Law, N.J.S.A. 2C:14-12 and 2C:44-8;[7] (2) indicate defendant was ordered to have no contact with the victim; and (3) the "significant" weight given to aggravating factor nine was amended to state "substantial" weight. This appeal followed.

## II.

In Point I, defendant argues that the trial court erred in denying his motion to suppress his statements to police after he advised he did not want to speak to them. According to defendant, the court erred in finding: (1) defendant had not invoked his right to counsel prior to Water's arrest; (2) in the alternative, had defendant invoked his right to counsel, he waived his right by initiating further communications with the police; and (3) defendant was never in custodial interrogation as required to attach Miranda protections.

We begin our analysis with the governing principles. "The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this State's common law, now embodied in statute, N.J.S.A.

---

[7] Enacted in 2007, Nicole's Law permits a victim of a sex offense to obtain a restraining order against the offender. See N.J.S.A. 2C:14-12 and 2C:44-8.

A-3743-18

2A:84A-19, and evidence rule, [Rule] 503." State v. S.S., 229 N.J. 360, 381-82 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "The administration of Miranda warnings ensures that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." State v. A.M., 237 N.J. 384, 397 (2019). To that end, a person subject to custodial interrogation "must be adequately and effectively apprised of his [or her] rights." Nyhammer, 197 N.J. at 400 (quoting Miranda, 384 U.S. at 467).

Before any evidence acquired through a custodial interrogation can be used against a defendant, "[t]he burden is on the prosecution to demonstrate not only that the individual was informed of [their] rights, but also that [they] . . . knowingly, voluntarily, and intelligently waived those rights." Id. at 400-01. Thus, "the State shoulders the burden of proving . . . that a defendant's confession was actually volunteered and that the police did not overbear the will of the defendant." State v. Hreha, 217 N.J. 368, 383 (2014). In turn, the trial court must determine whether the State has satisfied its heavy burden by proof "beyond a reasonable doubt[,]" State v. Yohnnson, 204 N.J. 43, 59 (2010) (alteration in original) (quoting State v. Presha, 163 N.J. 304, 313 (2000)), based

upon an evaluation of the "totality of the circumstances." Nyhammer, 197 N.J. at 405.

A "totality-of-the-circumstances analysis" requires the court to "consider such factors as defendant's 'age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] and whether physical punishment or mental exhaustion was involved.'" Id. at 402 (quoting Presha, 163 N.J. at 313). Pertinent to this appeal, in evaluating the totality of the circumstances, "[a] court may conclude that a defendant's confession was involuntary if interrogating officers extended a promise so enticing as to induce that confession." Hreha, 217 N.J. at 383. "Factors relevant to that analysis include, but are not limited to, 'the nature of the promise, the context in which the promise was made, the characteristics of the individual defendant, whether the defendant was informed of [his or her] rights, and whether counsel was present.'" Id. at 383-84 (quoting State v. Pillar, 359 N.J. Super. 249, 271 (App. Div. 2003)).

Moreover, these factors "should be assessed qualitatively, not quantitatively, and the presence of even one of those factors may permit the conclusion that a confession was involuntary." Id. at 384. However, while an investigator's "manipulative or coercive" statements may deprive a defendant

"of his [or her] ability to make an unconstrained, autonomous decision to confess[,]" State v. DiFrisco, 118 N.J. 253, 257 (1990) (quoting Miller v. Fenton, 796 F.2d 598, 605 (3d Cir. 1986)), "[e]fforts by a law enforcement officer to persuade a suspect to talk 'are proper as long as the will of the suspect is not overborne.'" State v. Maltese, 222 N.J. 525, 544 (2015) (quoting State v. Miller, 76 N.J. 392, 403 (1978)).

"Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" S.S., 229 N.J. at 374 (quoting State v. Gamble, 218 N.J. 412, 424 (2014)); see, e.g., State v. Dorff, 468 N.J. Super. 633, 643-44 (App. Div. 2021). This court must "accept the trial court's factual findings unless they are not supported by sufficient credible evidence in the record." Id. at 644. "In contrast, we review the trial court's legal conclusions de novo." Ibid. "Accordingly, [this court] [is] not bound by a trial court's interpretations of the legal consequences that flow from established facts." Ibid.

Moreover, "a trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court or because it would have reached a different

16

conclusion." S.S., 229 N.J. at 374. Indeed, "[a]n appellate court should not disturb a trial court's factual findings unless those findings are 'so clearly mistaken that the interests of justice demand intervention and correction.'" Ibid. (quoting Gamble, 218 N.J. at 425). This deferential standard of appellate review also applies to the trial court's "factual findings based on a video recording or documentary evidence." Id. at 381.

Applying these principles, we are satisfied that the court's factual findings are supported by sufficient credible evidence in the record and its legal conclusions are sound. The court found Detective Steele to be "more truthful and forthcoming," and defendant evasive and self-serving. The record shows defendant never requested an attorney and did not testify that he asked for an attorney at his police interview. Additionally, defendant was found to be an "intelligent man" and would have ostensibly requested an attorney at least initially or perhaps subsequently when he signed the Miranda waiver form. Thus, based on the totality of the circumstances, defendant knowingly, voluntarily, and intelligently waived his rights, and provided a voluntary statement, confessing to the charges.

## III.

In Point II, for the first time on appeal, defendant argues the trial court erred by finding he "was never in a custodial interrogation to trigger the requirements for <u>Miranda</u>." We review an issue not preserved for appeal at the trial court level for plain error. <u>R.</u> 2:10-2. This court "must disregard any unchallenged errors or omissions unless they are 'clearly capable of producing an unjust result.'" <u>State v. Santamaria</u>, 236 N.J. 390, 404 (2019) (quoting <u>R.</u> 2:10-2). "Plain error is a high bar and constitutes 'error not properly preserved for appeal but of a magnitude dictating appellate consideration.'" <u>Ibid.</u> (quoting <u>State v. Bueso</u>, 225 N.J. 193, 202 (2016)). The plain error's "high standard" "provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error." <u>Ibid.</u> (quoting <u>Bueso</u>, 225 N.J. at 203).

The trial court found defendant "was by no means in a custodial setting" when defendant spoke to the police: (1) at his home, at which time he "invoked" his right to counsel; and (2) at the police station, at which time defendant was interviewed by the detectives.[8]

---

[8] Defendant's interview at the police station was an interrogation. "[T]he term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to

Although defendant stresses the trial court erred in finding "there was no custodial interrogation," his arguments are limited to his custody at the police station interrogation and not when he "invoked" his right to counsel at his home. "The protections provided by Miranda are only invoked when a person is both in custody and subjected to police interrogation." Hubbard, 222 N.J. at 266 (emphasis added) (citing State v. P.Z., 152 N.J. 86, 102 (1997)). Therefore, defendant has waived this issue. Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) ("An issue not briefed on appeal is deemed waived."). We add the following remarks.

Defendant has not argued the police erred in reading him his Miranda rights prior to the interview at the station, or that his signed Miranda waiver was not a knowing, intelligent, and voluntary waiver of his rights. The determination of whether a person was in custody is an objective one, independent of "the

---

any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the [defendant]." State v. Hubbard, 222 N.J. 249, 267 (2015) (first alteration in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 300–01 (1980)). Here, the police should have known it was "reasonably likely to elicit an incriminating response" from defendant via their words and actions. Ibid. Thus, whether or not the defendant's Miranda protections apply is dependent on whether defendant was ever in fact in custody. Id. at 266.

subjective views harbored by either the interrogating officers or the person being questioned." Hubbard, 222 N.J. at 267 (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). The issue must be considered using "a case-by-case approach in which the totality of the circumstances [are] examined." State v. Stott, 171 N.J. 343, 364-65 (2002) (citation omitted) (quoting State v. Godfrey, 131 N.J. Super. 168, 175-77 (App. Div. 1974)).

Custody "does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a [defendant]'s home or a public place other than a police station." Id. at 364 (quoting Godfrey, 131 N.J. Super. at 175). "The critical determinant of custody is whether there has been a significant deprivation of the [defendant]'s freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the . . . status of the [defendant,]" and other such factors. Id. at 365.

Whether a defendant has been placed in custody is a fact-sensitive question within the discretion of the trial court. See Hubbard, 222 N.J. at 270 (holding the issue of whether a defendant was in custody is for the trial court to decide and is not subject to de novo review on appeal). We defer to the trial

court's factual findings so long as the findings "are based on sufficient credible evidence in the record." State v. L.H., 239 N.J. 22, 47 (2019).

Defendant's belated claim that he was in a custodial setting when at his home speaking to the police is belied by the record. The court's finding that defendant was not in custody is amply supported by sufficient credible evidence in the record. Unlike in Hubbard, here the trial court aptly determined defendant was not in custody because he: (1) "voluntarily entered the police station of his own accord to speak to the [d]etectives;" (2) "was never told he was not free to leave;" (3) "was never harassed to stay"; and (4) "never asked to relinquish his cell phone." Additionally, the questioning was neither repeated nor prolonged and did not involve physical punishment nor mental exhaustion.

We are also unpersuaded by defendant's contention that the trial court erred by finding he waived his right to counsel by initiating conversations with the police. A defendant who invokes his or her right to remain silent or to counsel waives that right if the defendant "initiates further communication, exchanges, or conversations with the police." State v. Wint, 236 N.J. 174, 194 (2018) (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)). "If an accused does initiate a conversation after invoking his [or her] rights, that conversation may be admissible if the initiation constitutes a knowing,

21

intelligent, and voluntary waiver of the accused's rights." State v. Chew, 150 N.J. 30, 61 (1997).

A defendant is considered to have initiated further communication if he or she invites "discussion of the crimes for which he [or she] was being held." Id. at 64 (quoting State v. Fuller, 118 N.J. 75, 82 (1990)). The State must establish it was the accused, rather than the police, who initiated any further questioning after the accused has invoked his or her right to counsel. State v. Wright, 97 N.J. 113, 122-23 (1984). In the matter under review, defendant does not deny that he initiated the subsequent conversation with the police. But defendant claims he did not initiate any discussion about the sexual assault allegations made against him.

Asking what happened to a co-defendant invites "discussion of the crimes for which he [or she] was being held." Chew, 150 N.J. at 64 (quoting Fuller, 118 N.J. at 82). In Fuller, the defendant invoked his right to remain silent, but subsequently asked the officers, "How did you know where I would be?" and "What happened to the other guy?" 118 N.J. at 82. Our Court held the defendant's questions left "no doubt that [the defendant] was inviting discussion of the crimes for which he was being held." Ibid. Here, defendant re-initiated communication with the police by asking, "Where is Waters going?" leaving no

22

doubt that he was inviting discussion of the crimes for which Waters was to be held.  See, e.g., Fuller, 118 N.J. at 82.

Moreover, defendant's decisions to drive to the police station and wait to speak with Detective Steele indicate an intervening circumstance "to dissipate the [constitutional] taint."  State v. Hartley, 103 N.J. 252, 284 (1986).  To determine whether "the constitutional taint" is dissipated, courts consider:

> the time between confessions, any intervening circumstances, whether there was a change in place, whether defendant received an adequate warning of his [or her] rights, whether the defendant initiated the second confession, the effect of his [or her] having previously made a confession, and the purpose and flagrancy of police misconduct.
>
> Maltese, 222 N.J. at 548 (internal quotations omitted) (quoting Hartley, 103 N.J. at 283).

Here, "the constitutional taint" of inquiring whether defendant would submit to an interview is clearly dissipated.

First, although the time between conversations was brief, defendant's interview was conducted in a separate location from where he claims the police violated his constitutional rights.  Second, defendant does not deny he received an adequate Miranda warning prior to his interview, nor does he deny signing a Miranda form.  Third, defendant admits to initiating the interview at the police station.  "[Defendant] testified that he gave [Waters]'s medications to an officer

23

at a window inside the station and asked why codefendant [Waters] was arrested . . . . He was told to sit down and to wait. [Defendant] complied, as he wanted to find out why [Waters] was arrested." Fourth, the only effect of defendant's previous conversation with the police was the result of his voluntary decision to speak with the police post delivering Waters's medications.

Defendant does not assert the police interviewed him or discussed Waters's case with him prior to his signing of the Miranda waiver. Consequently, even if the police's invitation to defendant violated his constitutional rights, the trial court correctly held defendant knowingly, intelligently, and voluntarily waived his constitutional rights by initiating further communication with the police at the police station, which effectively dissipated "the constitutional taint."

Next, defendant argues, again for the first time on his appeal, that his recorded statement violated his due process rights because his confession was not voluntary. Specifically, defendant claims the "detectives utilized various ploys to overcome [his] reluctance to speak," including "false promises, threats, and lies," which "overbore defendant's will[] and resulted in an involuntary statement." In response, the State claims, "[w]ith respect to [d]efendant's age

24

and intelligence, [he] was far from . . . naïve . . . and responded to the questioning with careful deliberation." Again, we review for plain error.

Even if a defendant waives his or her Miranda protections, a defendant's statement must still be voluntarily given pursuant to due process. Dorff, 468 N.J. Super. at 644 (quoting P.Z., 152 N.J. at 113). The State bears the burden to "prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne." L.H., 239 N.J. at 42 (quoting State v. Knight, 183 N.J. 449, 462 (2005)).

A defendant's statement or concession is not voluntary if it "is the product of physical or psychological coercion." Id. at 43 (quoting Miller, 76 N.J. at 405). "Unlike the use of physical coercion, however, use of a psychologically-oriented technique during questioning is not inherently coercive." State v. Galloway, 133 N.J. 631, 654 (1993). To determine whether an interrogating officer's questioning was psychologically coercive, the court weighs the defendant's coercive psychological pressures against the defendant's "power to resist confessing." L.H., 239 N.J. at 43.

The factors relevant to this determination include: (1) the defendant's age; (2) education; (3) intelligence; (4) previous encounters with the law; (5) "advice concerning constitutional rights"; (6) length of detention; (7) "whether the

25

questioning was repeated and prolonged in nature"; and (8) "whether physical punishment or mental exhaustion was involved." Ibid. (quoting Hreha, 217 N.J. at 383). Although each of these factors alone "may permit the conclusion that a confession was involuntary," Hreha, 217 N.J. at 384, "[t]he ultimate determination . . . will depend on the totality of the circumstances," L.H., 239 N.J. at 43 (citing Hreha, 217 N.J. at 383).

An interrogating officer is permitted to prevaricate during an interrogation to persuade a defendant to talk. See id. at 43-44. However, the interrogating officer may not tell a lie that creates coercive psychological pressures that overbear a defendant's power to resist. See id. at 44 (noting an interrogating officer may not tell a lie that has "the capacity to overbear a [defendant]'s will and to render a confession involuntary"). Certain lies are considered inherently coercive and, as such, impermissible. See, e.g., State in re A.S., 203 N.J. 131, 151 (2010) (holding an officer cannot directly or impliedly inform a defendant his or her statements will not be used against him or her (quoting Pillar, 359 N.J. Super. at 268)).

An officer's statement in conflict with a Miranda warning is inherently coercive. L.H., 239 N.J. at 44. Therefore, an officer may not claim a defendant's "statements will not be used against" the defendant. Ibid. (citing A.S., 203 N.J.

at 151 ("Not only was the veracity of such advice dubious . . . it also contradicted the <u>Miranda</u> warning provided to [the defendant] that anything she said in the interview could be used against her in a court of law.")); <u>see also</u> <u>State v. Puryear</u>, 441 N.J. Super. 280, 298 (App. Div. 2015) (finding impermissible an interrogator's representation to the defendant that he "could not hurt himself and could only help himself by providing a statement" because it "contradicted a key <u>Miranda</u> warning").

A false promise of leniency is not an inherently coercive lie. <u>See</u> <u>L.H.</u>, 239 N.J. at 44 (noting a false promise of leniency may be coercive if the lie, "under the totality of circumstances, ha[s] the capacity to overbear a [defendant]'s will"). Therefore, a promise of leniency is but "one factor to be considered in determining voluntariness," <u>id.</u> at 45, and the court must weigh the enticement of the promise against the defendant's power to resist, <u>id.</u> at 43; <u>Hreha</u>, 217 N.J. at 383.

Here, the interrogating officers' statements were not inherently coercive because they did not represent defendant's statements would not be used against him. Rather, the officers asserted defendant's cooperation would help mitigate his charges and his potential sentence. Defendant's statements were not

inherently coercive because they are not in direct conflict with the officer's Miranda warning. L.H., 239 N.J. at 44 (citing A.S., 203 N.J. at 151).

Here, the record shows the interrogating officers never offered defendant anything more than the opportunity to mitigate his charges and potential sentence. In contrast, the record supports defendant's "power to resist." First, the trial court found defendant's character to be "evasive," "self-serving," "calm," "point oriented," and strategic in his answers, only conceding points after the prosecution led him through minute details first. See also State v. Sheika, 337 N.J. Super. 228, 237-39 (App. Div. 2001) (noting the trial court's "credibility determination . . . was grounded in the court's opportunity to observe the character and demeanor of the witnesses").

Second, defendant was initially skeptical of the interrogating officers' deceit, which supports an inference of intelligence, knowledge, and experience. Third, defendant's decision to continue the interview after the interrogating officers' claimed Waters confessed indicates a purposeful and strategic decision on defendant's part to continue the interview for purposes of corroborating Waters's confession.

Fourth, it would be incongruous for defendant to argue that he had the intelligence and knowledge to invoke his constitutional rights of silence and

counsel at his home, prior to the officers' reading of defendant's <u>Miranda</u> rights, but became naïve to the effects of speaking with the police at the station merely one-half-an-hour later, after the officers' reading and defendant's signed waiver. Fifth, and most saliently, at the conclusion of the interview, the interrogating officers specifically asked defendant if he ever felt coerced or threatened throughout the interview and defendant repeatedly answered "no." In sum, the trial court correctly concluded defendant's statements to the police were voluntary and we discern no plain error in the denial of his motion to suppress his statements to the police.

## IV.

Next, in Point III, defendant argues, for the first time on appeal, the trial court should have sua sponte excluded evidence regarding the "C.J. incident"[9] or, in the alternative, admitted the evidence with a limiting instruction to the jury pursuant to Rule 404(b). Defendant contends the evidence "was irrelevant and unduly prejudicial." In response, the State asserts defendant's argument is barred pursuant to the "invited error" doctrine because "defense counsel

---

[9] The C.J. incident refers to a lawsuit, which alleged defendant had "made sexually inappropriate remarks to [another] high school student[, C.J.,] on a school class trip."

29

conceded to leaving in all references to C.J. without limiting instruction" prior to trial.

"We defer to a trial [judge]'s evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). "We will not substitute our judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)).

Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. In making this determination, the trial judge "should focus on the 'logical connection between the proffered evidence and a fact in issue[,]' and 'whether the [evidence offered] "renders the desired inference more probable than it would be without the evidence."'" State v. G.V., 162 N.J. 252, 263 (2000) (second alteration in original) (citations omitted) (first quoting State v. Hutchins, 241 N.J. 353, 358 (App. Div. 1990); and then quoting State v. Davis, 96 N.J. 611, 619 (1984)).

Even if evidence is deemed relevant, it may still be excluded. Rule 403 permits a trial judge to exclude evidence "if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confession of issues, or

misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. A trial judge "has broad discretion to exclude evidence as unduly prejudicial pursuant to [Rule] 403." State v. Jackson, 243 N.J. 52, 65 (2020) (quoting State v. Nantambu 221 N.J. 390, 402 (2015)).

Under Rule 404(b), bad act evidence, or evidence of "other crimes, wrongs, or acts," is inadmissible as evidence of a person's bad character or criminal predisposition; however, such evidence is admissible to prove "motive, opportunity, intent, . . . or absence of mistake or accident when such matters are relevant to a material issue in dispute." To determine whether to admit bad act evidence under Rule 404(b), trial courts apply the four-part Cofield test. State v. Krivacska, 341 N.J. Super. 1, 39 (App. Div. 2001) (citing State v. Cofield, 127 N.J. 328, 338 (1992)). The Cofield test requires the proffering party to prove:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[127 N.J. at 338 (quoting Abraham P. Ordover, Balancing the Presumptions of Guilt and Innocence: Rules 404(b), 608(b), and 609(a), 38 Emory L.J. 135, 160 (1989)).]

The admissibility of bad act "evidence is left to the [sound] discretion of the trial court." State v. Covell, 157 N.J. 554, 564 (1999); State v. Marrero, 148 N.J. 469, 483 (1997). If a trial court admits bad act evidence under Rule 404(b), it "must provide a limiting instruction that 'inform[s] the jury of the purposes for which it may, and for which it may not, consider the evidence of defendant's uncharged misconduct, both when the evidence is first presented and again as part of the final jury charge.'" State v. Garrison, 228 N.J. 182, 200 (2017) (alteration in original) (quoting State v. Rose, 206 N.J. 141, 161 (2011)). A trial court's admittance of bad act evidence and subsequent failure to provide a limiting instruction after the evidence was presented and as part of the final jury charge constitutes error. However, not every error is plain error. See State v. Funderburg, 225 N.J. 66, 79 (2016) (noting "we disregard any alleged error 'unless it is of such a nature as to have been clearly capable of producing an unjust result'" (quoting R. 2:10-2)).

An invited error is not a plain error. Under the "invited error" doctrine, errors "that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)). "[T]o rerun a trial when the mistake could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal." Krivacska, 341 N.J. Super. at 43; see also Santamaria, 236 N.J. at 409 (holding "even if it were [an] error [to admit evidence], a party cannot strategically withhold its objection to risky or unsavory evidence at trial only to raise the issue on appeal when the tactic does not pan out"). Only an invited error that "cut[s] mortally into the substantive rights of the defendant" will be reviewed on appeal. A.R., 213 N.J. at 562 (quoting Corsaro, 107 N.J. at 345).

Here, we conclude the admittance of bad act evidence in relation to the C.J. incident must be analyzed under the invited error doctrine. On June 5, 2018, the parties raised the C.J. incident before the trial court:

> [Prosecutor:] [T]he State did file a [Rule] 404[(b)] motion. . . . It makes reference to a lawsuit incident with an individual named C.J. . . . which is throughout the defendant's statement. From the State's perspective, it's really intrinsic to the statement. [The State] discussed it with [defense] counsel, [and the parties]

discussed [the motion] [in] chambers. It's [the State's] understanding . . . defendant does not want . . . a limiting instruction in that regard.

[Defense counsel:] That's correct. That lawsuit actually was . . . filed . . . against . . . Waters. [Defendant] do[es] [not] think it's significant enough to even warrant a limiting instruction. [Defendant] think[s] we just let the jury hear the statement when it's played and with no comment.

. . . .

[Prosecutor:] And, also, [Y]our Honor, [C.J.] is not on the witness list. The State did not plan on bringing anything up about him except what is in [defendant]'s statement.

After consenting to the inclusion of the C.J. incident evidence, defendant was left with the strategic options of: (1) "arguing for redaction of a significant amount of the statement, thus leaving the jury to speculate as to what was omitted"; or (2) "allowing the relatively harmless conduct involving C.J. in front of the jury without calling attention to it with a limiting instruction." "[T]he failure to request a limiting instruction [i]s anything but a well[-]reasoned strategic determination." Krivacska, 341 N.J. Super. at 43-44. Although the trial court admitted the bad act evidence and did not provide a limiting instruction after the evidence was presented and as part of the final jury charge, we conclude the error is an invited error, not a basis for reversal on appeal. A.R.,

34

213 N.J. at 561 (quoting Corsaro, 107 N.J. at 345). The court did not abuse its discretion in admitting the C.J. information into evidence.

V.

In Point IV, defendant contends the trial court should have sua sponte excluded the naked photographs of defendant pursuant to both Rule 402, relevance or "probative value," and Rule 403, undue prejudice. Defendant asserts even if the photographs depict him, "the photos were not probative of the only contested issue—D.U.'s age when he had sex with defendant." (Emphasis added). Again, we disagree.

A trial court is not required to sua sponte exclude photographs if the photographs are admissible under Rule 403. Santamaria, 236 N.J. at 408. "Relevant evidence" is defined as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. "Relevant evidence 'need not be dispositive or even strongly probative in order to clear the relevancy bar.'" Santamaria, 236 N.J. at 405 (quoting State v. Cole, 229 N.J. 430, 447 (2017)). "Instead, the relevancy threshold is met '[o]nce a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case.'" Ibid. (alteration in original) (quoting Cole, 229 N.J. at 448).

A-3743-18

Photographs may be probative of a victim's age if they help establish a pre-existing relationship between the parties.[10]  In Santamaria, the trial court admitted into evidence, without objection, sixty-five photographs of the victim and the defendant nude, semi-nude, and in sexual acts.  Id. at 407-08.  The defendant's face was not displayed in any of the photographs but was identified by the victim.  Id. at 407.  The photographs were taken after the victim had turned eighteen.  Id. at 405.  The Court held the photographs to be "relevant to establishing a pre-existing relationship between defendant and [victim], which in this case would mean a relationship while [victim] was underage.  The photos are therefore intrinsic to the prosecution's case."  Id. at 405-06.

Here, the trial court correctly determined the photographs are intrinsic to the prosecution's case.  Like in Santamaria, where the Court held nude photographs of the parties to be "relevant to establishing a pre-existing relationship between defendant and [victim]," id. at 405-06, here, "[a]t a minimum, the photographs provided evidence of a sexual relationship between" the parties.  Out of the twenty-four photograph negatives provided by D.U. to Detective Steele, twenty-two depicted Waters, defendant, and D.U. in locations

---

[10]  Proof of penetration is required to satisfy the basic elements of sexual assault. See N.J.S.A. 2C:14-2(c)(4).

such as Waters's art class, the Boy Scout camp, and the couple's home. "Several of the photos had written dates indicating that D.U. was under [sixteen] at the time they were taken . . . ." "The sheer number of photographs . . . is relevant to establishing a pre-existing relationship between defendant and [victim], which in this case would mean a relationship while [victim] was underage." Santamaria, 236 N.J. at 405-06.

We note that although defendant's point heading and conclusion claim the photographs did not satisfy both Rules 401 and 403, he failed to present an argument in his brief regarding his claim the photographs were prejudicial pursuant to Rule 403. Therefore, this issue is waived. Sklodowsky, 417 N.J. Super. at 657. Nonetheless, we add the following comments.

Probative evidence may "be excluded if its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, . . . misleading the jury[,] or . . . needless presentation of cumulative evidence." N.J.R.E. 403. Under Rule 403, "if the probative value of the evidence is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the issues," the evidence should be barred. Santamaria, 236 N.J. at 406 (internal quotations omitted) (alteration in original) (quoting Cole, 229

N.J. at 448). "The party urging the exclusion of evidence under [Rule] 403 retains the burden 'to convince the court that the [Rule] 403 considerations should control.'" Id. at 406-07 (quoting Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001)).

Nudity alone will not substantially outweigh a photographs' probative value. In State v. L.P., where photographs of the defendant's body provided direct corroboration of the victim's testimony, we held:

> It is not evident to us that any prejudice could have resulted from the jury's observation of the nude photographs of defendant's body, but even if some jurors found the photographs offensive, there is no basis for concluding that the court palpably abused its discretion in ruling that the probative value of the photographs was not substantially outweighed by the risk of such prejudice. We also note that defendant could have avoided any possible prejudicial impact of the photographs by simply stipulating that [the defendant's testimony] was accurate.
>
> [352 N.J. Super. 369, 378 (App. Div. 2002) (citation omitted) (citing State v. Thompson, 59 N.J. 396, 419– 21 (1971)).]

Here, defendant's nudity alone does not substantially outweigh the photographs' probative value under Rule 403.

Saliently, the admittance of the nude photographs constituted an invited error. And, defendant cross-examined Detective Steele about the photographs.

Finally, defense counsel referenced the photographs and their evidential role in summation:

> We do have the pictures you've seen of a naked man, one face up, one face down, they were in negative form. So we don't know whether [D.U.] did or did not see them. We're presuming that they would have been developed on February I think it was 16th or 18th of 2004. If you remember, there were [twenty-four] negatives which I think back then was kind of a normal negative pack, and you had the naked pictures. So[,] assuming it was [defendant], and we're not really sure, we can't really tell, but that was from February of 2004 when they were developed. And again, that is well past the key date here which is when [D.U.] turned [sixteen]. So those pictures were from when he was already [sixteen].

Based upon the doctrine of invited error, admittance of the photographs is not a basis for reversal. A.R., 213 N.J. at 561 (quoting Corsaro, 107 N.J. at 345). We are convinced the trial court did not err by admitting the photographs under the plain error rule either. R. 2:10-2.

## VI.

In Point V, defendant argues his sentence was excessive and the sentencing court erred by applying aggravating factor three, the risk that the defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), and aggravating factor nine, the need for deterring the defendant and others from violating the law, N.J.S.A. 2C:44-1(a)(9). Defendant contends the substantial weight the

court assigned to aggravating factors three and nine "was incompatible" with the court's application of mitigating factors seven, the defendant has no history of prior delinquency or criminal history or has led a law abiding life for a substantial period of time prior to the commission of the present offense, N.J.S.A 2C:44-1(b)(7), and eight, the defendant's conduct was the result of circumstances unlikely to recur, N.J.S.A. 2C:44-1(b)(8).

We review a trial judge's sentencing decision for an abuse of discretion. State v. Jones, 232 N.J. 308, 318 (2018). This deferential standard applies only when "the trial judge follows the [Criminal] Code and the basic precepts that channel sentencing discretion." State v. Trinidad, 241 N.J. 425, 453 (2020) (quoting State v. Case, 220 N.J. 49, 65 (2014)). We will "affirm the sentence of a trial [judge] unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines of the facts' to the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

A trial judge "must identify any relevant aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b) that apply to the case." Case,

220 N.J. at 64 (citing State v. Fuentes, 217 N.J. 57, 72 (2014)).  The judge must then "determine which factors are supported by a preponderance of [the] evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence."  State v. O'Donnell, 117 N.J. 210, 215 (1989).  The judge's application of these factors "must be supported by competent, credible evidence in the record."  Case, 220 N.J. at 64.

The sentencing court noted defendant's age and his "minor prior history." But the court also found defendant's conduct was "calculated," "predatory," and "repeated."  The court highlighted both defendant's invitation of D.U.'s parents to his house and providing marijuana and mushrooms to D.U. indicated an effort to isolate and use D.U. "for his own sexual gratification multiple times over."[11] Furthermore, defendant's complete lack of remorse and "repeated denials about having sexual relationships with [D.U.] when he was" fifteen justified assigning

---

[11]  Defendant argues although D.U. testified defendant and he had "used drugs, there was no evidence that [defendant] supplied or introduced drugs to D.U." Furthermore, defendant argues "[t]here was also no evidence to support the [trial] court's remark that [D.U.] used drugs to 'release some of his inhibitions.'" See also Case, 220 N.J. at 64 ("Speculation and suspicion must not infect the sentencing process; simply put, the finding of aggravating or mitigating factors must be based on evidence.").  The trial court, however, did not find defendant "supplied or introduced drugs to D.U." but merely noted defendant "shared marijuana and mushrooms with [D.U.]"

A-3743-18

substantial weight to this factor regardless of defendant's age or prior criminal history.

In addition, the sentencing court gave considerable weight to mitigating factor seven and noted this did not discount the court's "findings as to aggravating [factors] [three] and [nine]." The court assigned "extremely light weight" to mitigating factor eight and agreed with defendant that to the extent Waters introduced him to D.U. and Waters is now retired, "those were circumstances unlikely to recur."

In Fuentes, where the Court reviewed the application of aggravating factor nine and mitigating factors seven and eight, the Court held "[b]ecause N.J.S.A. 2C:44–1's statutory language does not suggest . . . that aggravating factor[s] . . . and mitigating factor[s] . . . are inherently incompatible, we do not adopt such an inflexible rule." 217 N.J. at 79. The Court emphasized although certain factors may "rarely apply in the same sentenc[e]," the Court could "not hold that [such] factors are irreconcilable." Id. at 79-80. "Neither the statutory language nor the case law suggest that a [trial] or sentencing court can find a need" for one factor at the expense of another. See id. at 80.

The Court held where aggravating and mitigating factors appear inconsistent to one another, a trial court "should explain how it reconciles those

two findings." Id. at 81. Inconsistent aggravating and mitigating factors are not inherently irreconcilable so long as the factors are independently supported by substantial credible evidence. See Case, 220 N.J. at 67 (holding the sentencing court's finding of mitigating factor seven to stand "as a counterpoise to the finding of a risk that defendant was likely to commit another offense" where the trial court's finding of aggravating factor three "was based not on credible evidence in the record but [rather] on the unfounded assumption that defendant had pursued minors . . . on previous occasions"). These considerations did not result in the court abusing its discretion in finding aggravating factors three and nine and mitigating factors seven and eight.

Finally, defendant argues the trial court failed to apply mitigating factor nine, the character and attitude of the defendant indicate that the defendant is unlikely to commit another offense. N.J.S.A. 2C:44-1(b)(9). "[R]emand may be required when a reviewing court determines that a [trial] court failed to [consider] mitigating factors that clearly were supported by the record." State v. Bieniek, 200 N.J. 601, 608-09 (2010); see also State v. Dalziel, 182 N.J. 494, 506-07 (2005) (holding "the [trial] judge may determine . . . the weight to be ascribed to [a] mitigating factor . . . . [but] [a] trial judge's failure to acknowledge [a factor], which was fully supported by the record," is an error). As such,

"[m]itigating factors that 'are called to the court's attention' should not be ignored, and . . . [if] 'supported by credible evidence' are required to 'be part of the deliberative process.'" Case, 220 N.J. at 64 (first quoting State v. Blackmon, 202 N.J. 283, 297 (2010); then quoting Dalziel, 182 N.J. at 504; and then quoting id. at 505).

At the sentencing hearing, the court stated it rejected mitigating factor nine:

> [F]or the reasons . . . given as to aggravating factors [three] and [nine]. This defendant has repeatedly shown that his character and attitude are inconsistent with this finding. . . . rooted in his complete lack of remorse for this matter, his continual blame and belittling of the victim in this matter throughout.

The court did not abuse its discretion in rejecting mitigating factor nine or by imposing defendant's sentence, which was based upon substantial credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3743-18